# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TENNESSEE; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF GEORGIA; STATE OF INDIANA; STATE OF IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF NEBRASKA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; COMMONWEALTH OF VIRGINIA; and STATE OF WEST VIRGINIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. _____ |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE A. BURROWS, in her official capacity as Chair of the Equal Employment Opportunity Commission; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; and KRISTEN CLARKE, in her official capacity as Assistant Attorney General for Civil Rights at the United States Department of Justice, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This case involves the Equal Employment Opportunity Commission's ("EEOC")
continued attempt to use "harassment" guidance to extend Title VII's protections against sex-
based discrimination to new contexts related to "gender identity." Tennessee challenged and
Judge Atchley enjoined EEOC's substantially similar earlier guidance on the basis that it
expanded the scope of existing Title VII rules, and thus needed to proceed through notice-and-

comment. *See* Mem. Op. & Order (**Exhibit A**). Now, by a divided 3-2 vote, EEOC has doubled down on its gender-identity directives by publishing its Enforcement Guidance on Harassment in the Workplace ("Enforcement Document") (**Exhibit B**). In the Enforcement Document, EEOC directs all employers that failing to accommodate their employees' self-professed gender identities—in areas ranging from preferred pronouns to private changing spaces and restrooms—violates Title VII. This new regime threatens Tennessee, its co-Plaintiff States, and countless other employers with enforcement actions and civil liability unless they promote the gender-identity preferences of their employees. Plaintiffs bring this suit to again enjoin EEOC's unlawful expansion of Title VII to create new gender-identity rules, and to obtain ultimate vacatur of the Enforcement Document's unlawful approach.

## INTRODUCTION

1.      EEOC's Enforcement Document is an exemplar of recent federal agency efforts to enshrine sweeping gender-identity mandates without congressional consent. Among other things, the Enforcement Document declares that Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, requires all covered employers and employees to use others' preferred pronouns; allow transgender individuals to use the shower, locker room, or restroom that corresponds to their gender identity; and refrain from requiring employees to adhere to the dress code that corresponds to their biological sex.

2.      EEOC relies heavily on the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), to prescribe broad swaths of employer conduct. But *Bostock* was a narrow decision. The Court held only that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of . . . sex" under Title VII. *Bostock*, 590 U.S. at 650-51. The Court expressly declined to "prejudge" issues like "bathrooms, locker rooms, and dress codes" under Title VII's anti-discrimination provision. *Id.* at 681.

3. This Court previously held that the substantially similar provisions of EEOC's prior guidance went "beyond the holding of *Bostock*" by "identif[ying] and creat[ing] rights for applicants and employees that have not been established by federal law." *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 839-40 (E.D. Tenn. 2022). For this reason, this Court concluded that EEOC needed to subject its novel gender-identity guidance to notice-and-comment procedures. *Id.* at 840. EEOC did so, but the substantive flaws with EEOC's reading of Title VII that this Court previously found unnecessary to address remain.

4. EEOC's proposal drew substantial opposition. Tennessee led a coalition of twenty States opposing the proposed guidance on statutory, constitutional, and Administrative Procedure Act ("APA") grounds. *See* States' Comment Letter (**Exhibit C**). The States explained that neither Title VII, nor *Bostock*, nor any other federal precedent gives EEOC license to impose a gender-identity accommodation mandate, which flunks major-question scrutiny and raises constitutional concerns. *Id.* at 3-7. They also highlighted that Congress has only authorized EEOC to promulgate *procedural* rules, not sweeping substantive mandates like the Enforcement Document. *Id.* at 5-6. And the States also detailed the First Amendment problems raised by the proposed gender-identity-accommodation mandate as well as the separation-of-powers problems inherent to EEOC's putative "independent" structure. *Id.* at 7-9. Finally, the States identified several regulatory problems that EEOC had failed to consider when crafting its guidance, including the long-recognized privacy and safety justifications for sex-segregated spaces, the difficulties of discerning and authenticating gender identity, the gender-identity-accommodation mandate's potential adverse impacts on workplace morale, and the federalism implications of EEOC's proposal. *Id.* at 9-12.

5. The issues ostensibly covered by the Enforcement Document are of enormous importance to the States, employers, employees, and other individual citizens. But EEOC has

no authority to resolve these highly controversial and localized issues, which are properly reserved for Congress and the States.

6.    Because EEOC overreaches to "interpret" federal antidiscrimination law far beyond what the statutory text, the APA, judicial precedent, and the U.S. Constitution permit, the Enforcement Document should be set aside.

7.    Plaintiffs—the States of Tennessee, Alabama, Alaska, Arkansas, Georgia, Indiana, Iowa, Kansas, Mississippi, Missouri, Nebraska, Ohio, South Carolina, South Dakota, Utah, and West Virginia, as well as the Commonwealths of Kentucky and Virginia—thus bring this suit to seek preliminary and permanent relief.  They ask this Court to preliminarily enjoin Defendants from enforcing the Enforcement Document's unlawful gender-identity-accommodation mandate against the States pending judicial review.  And Plaintiffs request that this Court ultimately declare unlawful, vacate, and set aside the Enforcement Document.

## PARTIES

8.    Plaintiff the State of Tennessee is a sovereign State and an employer subject to the requirements of Title VII.  The State of Tennessee employs approximately 43,000 individuals across all 95 of the State's counties, not including employees at the State's public institutions of higher education.  Tennessee also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

9.    Plaintiff the State of Alaska is a sovereign State and an employer subject to the requirements of Title VII.  The State of Alaska employs approximately 15,000 individuals.  Alaska also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

10.    Plaintiff the State of Arkansas is a sovereign State and an employer subject to the requirements of Title VII.  Arkansas currently employs roughly 30,200 people in various

capacities across every county in the State. Tim Griffin is the Attorney General of Arkansas, and he is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts." Ark. Code Ann. 25-16-703(a).

11.     Plaintiff the State of Georgia is a sovereign State and an employer subject to the requirements of Title VII. The State of Georgia employs over 68,000 individuals across all 159 of the State's counties. Georgia also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

12.     Plaintiff the State of Indiana is a sovereign State and an employer subject to the requirements of Title VII. The State of Indiana employs over 31,000 individuals, not including employees at the State's public institutions of higher education. Indiana also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

13.     Plaintiff the Commonwealth of Kentucky is a sovereign State and an employer subject to the requirements of Title VII. The Commonwealth of Kentucky employs approximately 96,000 individuals across all 120 of its counties. This number includes the executive, legislative, and judicial branches of government; public elementary, middle, and high schools; state colleges and universities; state-owned hospitals, nursing, and residential care facilities; and state-owned parks, museums, and historical sites. Kentucky also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

14.     Plaintiff the State of Mississippi is a sovereign State and an employer subject to the requirements of Title VII. The State of Mississippi currently employs approximately 24,000 full-time employees in various capacities across the State's 82 counties. Mississippi also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

15.     Plaintiff the State of Nebraska is a sovereign State and employer subject to the requirements of Title VII. The State of Nebraska and its agencies employ approximately 22,000

employees, not including employees of the State's university system or State colleges. Nebraska also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

16. Plaintiff the State of South Carolina is a sovereign State and an employer subject to the requirements of Title VII. The State of South Carolina employs approximately 60,000 individuals across the State, including employees at the State's public institutions of higher education. South Carolina also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

17. Plaintiff the State of South Dakota is a sovereign State and an employer subject to the requirements of Title VII. The State of South Dakota employs approximately 11,559 individuals. South Dakota is also home to political subdivisions and other employers that are subject to the requirements of Title VII.

18. Plaintiff the Commonwealth of Virginia is a sovereign State and an employer subject to the requirements of Title VII. The Commonwealth of Virginia employs approximately 70,000 individuals, not including employees at the Commonwealth's public institutions of higher education. Virginia also is home to political subdivisions and other employers that are subject to the requirements of Title VII.

19. Plaintiff the State of West Virginia is a sovereign State and an employer subject to the requirements of Title VII. West Virginia also is home to political subdivisions and other employers that are subject to the requirements of Title VII. The State of West Virginia and its political subdivisions employ approximately 150,000 individuals across all 55 of the State's counties.

20. Plaintiffs Alabama, Iowa, Kansas, Missouri, Ohio, and Utah likewise are sovereign States and employers subject to the requirements of Title VII. These Plaintiff States

6

also are home to political subdivisions and other employers that are subject to the requirements of Title VII

21.     Defendant Equal Employment Opportunity Commission is a federal agency charged with limited enforcement of, among other things, Title VII. 42 U.S.C. § 2000e-4. EEOC may issue "right-to-sue" letters that allow private individuals to sue their employers for violating EEOC's interpretations of Title VII. *See id.* § 2000e-5(f). EEOC also may refer charges of discrimination against state and local governments to the Department of Justice's Civil Rights Division for further investigation and enforcement.

22.     Defendant Charlotte A. Burrows is the Chair of EEOC. As Chair, she is responsible for implementation and administration of EEOC policy. She is sued in her official capacity.

23.     Defendant United States Department of Justice ("DOJ") is an executive agency of the United States and is responsible for the enforcement of, among other things, Title VII against state and local governments. 42 U.S.C. §§ 2000e-4, 2000e-6.

24.     Defendant Merrick B. Garland is the Attorney General of the United States and is responsible for the operation of the DOJ, including its enforcement of Title VII. He is sued in his official capacity.

25.     Defendant Kristen Clarke is the Assistant Attorney General for Civil Rights at DOJ and is assigned the responsibility to bring enforcement actions under Title VII. 28 C.F.R. § 42.412. She is sued in her official capacity.

## JURISDICTION AND VENUE

26.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the Plaintiff States challenge EEOC's actions under the APA's provision for judicial review of agency action, 5 U.S.C. § 702, and other federal laws.

7

27. This Court has jurisdiction under 28 U.S.C. § 1346 because this case involves claims against agencies and employees of the federal government.

28. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

29. This Court has the authority to grant Plaintiff States the relief they request under the APA, 5 U.S.C. §§ 705-06; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; and the court's inherent equitable powers.

30. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (1) Defendants are agencies of the United States and officers thereof acting in their official capacities, (2) Plaintiff State of Tennessee is a resident of every judicial district in its sovereign territory, including this district and division, and (3) "a substantial part of the events or omissions giving rise to [Tennessee's] claim occurred" in this District.

31. The Knoxville Division of the Eastern District of Tennessee is a proper division for this action because Tennessee's agencies and employees subject to the agency actions at issue reside in this division, Tennessee's Attorney General maintains a physical office in this division, and no Defendant resides in the State of Tennessee.

## FACTUAL ALLEGATIONS

**I.      Title VII's Prohibition on Sex Discrimination and *Bostock*'s Narrow Holding.**

32. Congress enacted Title VII in 1964 to prohibit discrimination in employment based on an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

33. Congress's "major concern" was ending "race discrimination." *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662 (9th Cir. 1977), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, (1989). But one day before the House approved the

legislation, the word "sex" was added as a floor amendment. *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984).

34.    The sex-discrimination prohibition was understood by all to address the lack of "equal opportunities for *women*" in employment, *Sommers v. Budget Marketing, Inc*., 667 F.2d 748, 750 (8th Cir. 1982) (per curiam) (emphasis added), to "ensure that men and women are treated equally," *Holloway*, 566 F.2d at 663.

35.    In *Bostock*, the U.S. Supreme Court considered only whether Title VII's prohibition on employment discrimination "because of" an individual's "sex," 42 U.S.C. § 2000e-2(a)(1), includes terminating an employee simply for "being homosexual or transgender." *See* 590 U.S. at 650-51.

36.    The Court assumed that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

37.    And the Court held that "because of" sex means "by reason of" or "on account of" sex. *Id.* at 656 (citation omitted).

38.    The Court concluded that Title VII's prohibition on discrimination "because of . . . sex" imposed a "but-for" causation standard, which asks whether the employee would have suffered an adverse employment action but for her sex. *See id.*

39.    Applying that standard, the Court held that terminating an individual simply for "being homosexual or transgender" is prohibited employment discrimination under Title VII because "[s]ex plays a necessary and undisguisable role" in such decisions. *See id.* at 651-52.

40.    The Court did not consider or decide questions about any other workplace activity or employment action.

41.    Most relevant here, *Bostock* explicitly declined to consider whether Title VII's prohibition on sex discrimination requires deeply controversial gender-identity accommodations

for homosexual and transgender employees. The Court clarified that it was not considering whether employers lawfully may maintain "sex-segregated bathrooms, locker rooms, . . . dress codes[,] . . . or anything else of the kind." *Id.* at 681.

42.     Recognizing the free-exercise implications of its *Bostock* holding, the Court emphasized that employers retain statutory and constitutional protections against violations of their "religious convictions." *Id.* at 681-82. Title VII "include[s] an express statutory exception for religious organizations." *Id.* at 682. "[T]he First Amendment can bar the application of employment discrimination laws 'to claims concerning the employment relationship between a religious institution and its ministers.'" *Id.* (quoting *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 188 (2012)). And the Religious Freedom Restoration Act "prohibits the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest." *Id.* (citing 42 U.S.C. § 2000bb–1). But because no religious liberty claim was before the Court in *Bostock*, it reserved judgment on how these doctrines interact with Title VII, while acknowledging that "other employers in other cases may raise free exercise arguments that merit careful consideration." *Id.*

## II.     The Biden Administration's Crosscutting Gender-Identity Directive.

43.     Ignoring the Court's express limitations on *Bostock*'s scope, President Biden declared on his first day in office that *Bostock*'s analysis had changed the meaning of all federal law regarding sex discrimination: "Under *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 *et seq.*), the Fair Housing Act, as amended (42 U.S.C. 3601 *et seq.*), and section 412 of the Immigration and Nationality Act, as amended (8 U.S.C. 1522), along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual

orientation, so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021).

44.    Thus, as one of his first official acts as President, President Biden directed federal agencies to "review all existing orders, regulations, guidance documents, policies, programs, or other agency actions" that either "(i) were promulgated or are administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination, including any that relate to the agency's own compliance with such statutes or regulations" or "(ii) are or may be inconsistent with the policy set forth" in the Executive Order.  *Id.* at 7023-24.

45.    President Biden further directed that the "head of each agency shall, as soon as practicable, also consider whether there are additional actions that the agency should take to ensure that it is fully implementing the policy" set forth in the Executive Order.  *Id.* at 7024.

46.    Finally, President Biden directed that within "100 days of the date of this order, the head of each agency shall develop, in consultation with the Attorney General, as appropriate, a plan to carry out actions that the agency has identified[.]"  *Id.*

## III.    EEOC's Unlawful 2021 Gender-Identity Guidance.

### A.    The 2021 Guidance's Gender-Identity Mandates and Extension of *Bostock*.

47.    In response to Executive Order No. 13,988, federal agencies began applying *Bostock*'s Title VII reasoning to other federal laws that prohibit sex discrimination and in scenarios other than discriminatory termination.

48.    In June 2021, EEOC issued a "technical assistance document" "upon approval of the Chair," purporting to reflect EEOC's interpretation of what constitutes discrimination under Title VII in certain circumstances.  EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), https://perma.cc/J34Z-6ERM

("2021 Guidance"). That same month, the Department of Education ("Department") announced its view that *Bostock*'s Title VII analysis applies to Title IX. U.S. Dep't of Educ., Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021); U.S. Dep't of Educ., Letter to Educators on Title IX's 49th Anniversary (June 23, 2021), https://perma.cc/A759-WKR9 (collectively, "Title IX Guidance").

49.     EEOC's 2021 Guidance extended *Bostock*'s discrimination reasoning to situations the Court expressly declined to consider. For example, even though *Bostock* "d[id] not purport to address" issues like "bathrooms, locker rooms, and dress codes," 590 U.S. at 681, the 2021 Guidance heavily relied on the Court's decision to declare that prohibiting a transgender person from dressing consistent with that person's gender identity would constitute sex discrimination under Title VII. And it directed that employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity. The 2021 Guidance also required employers to accommodate transgender employees' preferred pronouns.

**B.      The States' Successful Suit to Enjoin the 2021 Guidance.**

50.     The State of Tennessee, joined by nineteen other States, sued under the APA to challenge EEOC's 2021 Guidance and the Department's Title IX Guidance, raising procedural and substantive challenges to unlawful attempts by unelected bureaucrats to rewrite longstanding federal civil rights statutes. *Tennessee v. U.S. Dep't of Educ.*, 3:21-cv-308 (E.D. Tenn.). The States sought declaratory and injunctive relief.

51.     The States argued that EEOC's 2021 Guidance was a legislative rule that the agency lacked authority to promulgate under Title VII because "Congress, in enacting [that

statute], did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title." *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976).

52.     Instead, Congress granted EEOC the authority to promulgate only "suitable *procedural regulations* to carry out the provisions" of Title VII.  42 U.S.C. § 2000e-12 (emphasis added).

53.     The States also argued that the 2021 Guidance violated Title VII by unreasonably extending *Bostock*'s reasoning to circumstances that were not before the Court, including sex-segregated bathrooms, locker rooms, and dress codes.

54.     And the States argued that the 2021 Guidance crossed constitutional limits under the Tenth Amendment, the Eleventh Amendment, and the separation of powers.

55.     Finally, the States argued that the 2021 Guidance—which Chair Burrows promulgated unilaterally and without opportunity for any public comment or vote by the full Commission—was invalid because it had not gone through the notice-and-comment procedures required for legislative rules.

56.     This Court granted the States' request for a preliminary injunction against enforcement of the 2021 Guidance, finding the States were likely to succeed on their notice-and-comment argument under the APA.  *Tennessee*, 615 F. Supp. 3d at 839-40, 842.

57.     According to the court, the States could establish that the 2021 Guidance was a legislative rule that needed public input, and because EEOC had "failed to comply with the required notice and comment procedures under the APA," the court held that the guidance was likely "invalid."  *Id.* at 840.

58.     The court did not reach the States' other substantive challenges to the 2021 Guidance, but in holding that the 2021 Guidance was final agency action, the court explained that *Bostock* "does not require" EEOC's "interpretation[] of Title VII."  *Id.* at 833.  The court

went on: "[EEOC] ignore[s] the limited reach of *Bostock*" and "fail[s] to cabin [itself] to *Bostock*'s holding." *Id.* Instead, EEOC's 2021 Guidance "advance[d] *new* interpretations of Title VII … and impose[d] *new* legal obligations on regulated parties." *Id.* (emphases in original). The court reiterated that the 2021 Guidance went "beyond the holding of *Bostock*" by "identif[ying] and creat[ing] rights … that have not been established by federal law." *Id.* at 839-40. Finally, the court explained that "until the Sixth Circuit or the Supreme Court recognizes … that Title VII prohibits discrimination based on sexual orientation and gender identity with respect to bathrooms, locker rooms, and dress codes[,] such rights and obligations have not been established under federal law." *Id.* at 840 n.17.

59.    EEOC appealed the court's preliminary injunction, but the Sixth Circuit has not yet rendered a decision in that appeal. *See Tennessee v. U.S. Dep't of Educ.*, No. 22-5807 (6th Cir.) (argued Apr. 26, 2023).

60.    In a parallel challenge to EEOC's 2021 Guidance brought by the State of Texas, the Northern District of Texas agreed that the guidance was invalid because it had not gone through notice-and-comment procedures. *Texas v. EEOC*, 633 F. Supp. 3d 824, 841-42 (N.D. Tex. 2022).

61.    The Texas court, however, went further, finding that EEOC lacked authority to issue the 2021 Guidance in the first place and observing that *Bostock*'s analysis did not reach as far as EEOC had suggested. *See id.* at 839-45.

62.    The court held that because the 2021 Guidance was a substantive rule, EEOC had exceeded its rulemaking authority under 42 U.S.C. § 2000e-12(a). *Id.* at 841-42.

63.    And because *Bostock*'s "non-discrimination holding" was "cabined to 'homosexuality and transgender *status*,'" the court rejected the EEOC's argument that Title VII's

prohibition on sex-discrimination "extend[s] to correlated *conduct*." *Id.* at 829-30 (emphases in original).

64.     The court denied any "'false distinction' between status and conduct," citing *Bostock*'s repeated presumption that "there will be Title VII cases where the protected class 'sex' may not reach particular conduct"; distinguished the Supreme Court's decisions in *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010), and *Lawrence v. Texas*, 539 U.S. 558 (2003); and explained that Title VII decisions from the Supreme Court and the federal appellate courts "reveal[] that 'status' and 'conduct' do not *necessarily* merge every time an employee plausibly pleads a 'closely associated' trait." *Texas*, 633 F. Supp. 3d at 834-36 (emphasis in original).

65.     Because EEOC lacked authority to issue the 2021 Guidance, and because that guidance erroneously extended *Bostock*'s "non-discrimination holding" beyond the limits Congress imposed under Title VII, the court granted summary judgment for Texas, vacating and setting aside the 2021 Guidance. *Id.* at 847.

66.     The EEOC declined to appeal the Texas court's vacatur of the 2021 Guidance.

## IV.     EEOC's Enforcement Document and Continued Attempt to Read Gender-Identity Mandates into Rules Against Workplace Harassment.

### A.     EEOC's Proposed Enforcement Document.

67.     In October 2023, EEOC proposed new enforcement guidance reflecting essentially the same interpretation of Title VII's prohibition on sex discrimination set forth in the agency's vacated 2021 Guidance, this time presenting examples of what the agency considers "sex-based harassment" and requesting public comments.  EEOC, Proposed Enforcement Guidance on Harassment in the Workplace, 88 Fed. Reg. 67,750 (Oct. 2, 2023) ("Proposed Enforcement Document").  The Proposed Enforcement Document was published on EEOC's website.  *See* https://perma.cc/KYA9-Z5RX.

15

68.     The Proposed Enforcement Document acknowledged *Bostock*'s holding that Title VII's prohibition on sex-based discrimination includes terminating an employee because of his or her sexual orientation or gender identity. But EEOC proposed that, under *Bostock*'s reasoning, Title VII also prohibits "sex-based harassment … on the basis of sexual orientation and gender identity, including how that identity is expressed." Among the circumstances that would constitute sex-based harassment, the Proposed Enforcement Document included "misgendering" and "den[ying] … access to a bathroom or other sex-segregated facility consistent with the individual's gender identity."

69.     EEOC provided the following example of "Harassment Based on Gender Identity":

> Jennifer, a cashier at a fast food restaurant who identifies as female, alleges that supervisors, coworkers, and customers regularly and intentionally misgender her. One of the supervisors, Allison, frequently uses Jennifer's prior male name, male pronouns, and "dude" when referring to Jennifer, despite Jennifer's request for Allison to use correct name and pronouns; other managers also intentionally refer to Jennifer as "he." Coworkers have asked Jennifer questions about her sexual orientation and anatomy and asserted that she was not female. Customers also have intentionally misgendered Jennifer and made threatening statements to her, but her supervisors did not address the harassment and instead reassigned her duties outside of the view of customers. Based on these facts, Jennifer has alleged harassment based on her gender identity.

70.     Thus, the Proposed Enforcement Document again attempted to extend *Bostock* to situations that the Court explicitly declined to "prejudge"—*e.g.*, bathrooms and pronouns—while also proposing to impose liability on employers for the conduct of their customers or other third parties.

**B.      Comments Highlighting Legal and Practical Flaws with EEOC's Proposed Approach.**

71.     Demonstrating the significance of EEOC's redefinition of sex-based discrimination under Title VII, as well as the strength of opposition to it, the Proposed

16

Enforcement Document generated more than 38,000 public comments during the short 30-day comment period.

72.     The State of Tennessee and nineteen other co-signing States commented on the Proposed Enforcement Document, highlighting statutory, constitutional, and APA flaws in EEOC's new interpretation of Title VII.

73.     *First*, the States explained that the Proposed Enforcement Document contravenes EEOC's statutory authority. States' Comment Letter at 3-4. *Bostock*'s narrow holding does not support the agency's expanded application of Title VII to all transgender-related employment issues, such as sex-segregated bathrooms and use of pronouns.

74.     EEOC proposed essentially to amend Title VII to create a *de facto* accommodation for gender identity—even though *Bostock* did not address the accommodations context. As the States explained, Congress knew how to require accommodations for certain classes in Title VII, *see, e.g.*, 42 U.S.C. § 2000e(j) (mandating religious accommodations), yet has thus far declined to do so for transgender persons. States' Comment Letter at 4.

75.     The Proposed Enforcement Document erroneously expanded *Bostock* to prohibit discrimination based on "sexual orientation" or "gender identity," even though the Court had only addressed "homosexuality" and "transgender status." 590 U.S. at 680. The States explained that "gender identity" is an expansive term that is not "'inextricably bound up with sex' in the way *Bostock* cast transgender status"—noting that even transgender rights advocates have acknowledged "gender identity" can encompass "numerous identities that fall entirely outside of the biological binary of male and female." States' Comment Letter at 4.

76.     The States also argued that the major-question doctrine and constitutional avoidance cannons foreclosed the Proposed Enforcement Document's interpretation of Title VII. *Id*. at 6-7.

77.     More fundamentally, the States explained that the Proposed Enforcement Document exceeds EEOC's narrow rulemaking authority, which empowers the Commission to adopt only "*procedural regulations* to carry out the provisions of this chapter"—not substantive rules like that challenged here.  *Id*. at 5-6 (quoting 42 U.S.C. § 2000e-12(a) (emphasis added)).

78.     *Second*, the States raised objections that the Proposed Enforcement Document violates the Constitution.  As an initial matter, EEOC's understanding of Title VII implicates First Amendment concerns.  *Id*. at 7-8.  For example, the States warned that the Proposed Enforcement Document would unlawfully compel employers to convey government-preferred messages on controversial topics.  The Proposed Enforcement Document would allow employers and their employees to speak without restriction when they embrace an ideology of mutable gender divorced from sex, but they would face liability if they were to do otherwise.  *Id.* at 8.  Such viewpoint-based limitations on speech are particularly problematic.  *Id.*  Indeed, the Sixth Circuit recently held that a public university's policy requiring its faculty to use students' preferred pronouns violated a professor's free-speech rights.  *See Meriwether v. Hartop*, 992 F.3d 492, 511-12 (6th Cir. 2021).  The States also noted that the gender-identity accommodations required by the Proposed Enforcement Document conflicted with the free-exercise rights of their citizens. States' Comment Letter at 8.

79.     The States also explained that EEOC's putative "independent" status violates Article II of the Constitution, which vests "'the executive Power'—all of it"—in the President.  *Id.* at 8-9 (quoting *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020)).

80.     *Third*, the States argued that the Proposed Enforcement Document was arbitrary and capricious under the APA.  The Proposed Enforcement Document failed to consider or address the long-recognized privacy and safety justifications for sex-segregated spaces.  *Id.* at 9-10.  Nor did it address how opening those spaces to individuals based on their "gender identity"

would impact workplace morale.  *Id.* at 10-11.  The Proposed Enforcement Document likewise failed to meaningfully address the difficulties of discerning and authenticating gender identity, which advocates concede can be "fluid."  *Id.* at 11.

81.  And because the Proposed Enforcement Document would override state laws meant to protect privacy in sex-segregated bathrooms, *see, e.g.*, *Tennessee*, 615 F. Supp. 3d at 823 n.9 (noting such laws in Nebraska, Oklahoma, Tennessee, and West Virginia), the States objected to the EEOC's failure to adequately account for federalism concerns.  States' Comment Letter at 12.

### C.  EEOC's Final Enforcement Document.

82.  Undeterred, EEOC finalized the Enforcement Document on April 29, 2024.  The Enforcement Document is nearly identical to the Proposed Enforcement Document, and it is substantially the same as the 2021 Guidance that this Court preliminarily enjoined and that the Texas district court ultimately vacated and set aside as unlawful.  The purpose of the Enforcement Document, according to EEOC, is "to provide clarity to the public regarding existing requirements under the law or agency policies."  Enforcement Document at 2.

83.  Citing *Bostock*, the Enforcement Document provides that "[s]ex-based discrimination under Title VII includes employment discrimination based on sexual orientation or gender identity," and thus, "sex-based harassment includes harassment based on sexual orientation or gender identity, including how that identity is expressed."  *Id.* at 17.

84.  The Enforcement Document provides a list of examples of "[h]arrassing conduct" based on sexual orientation or gender identity.  One example is "repeated and intentional use of a name or pronoun inconsistent with [an] individual's known gender identity (misgendering)."  *Id.*  Another is an employer's "denial of access to a bathroom or other sex-segregated facility consistent with [an] individual's gender identity."  *Id.*  The Enforcement Document also makes

clear that it is unlawful to act against an employee for not "present[ing] in a manner that would stereotypically be associated with that person's sex." *Id.* Thus, the Enforcement Document extends *Bostock*'s prohibition on discrimination based on "sexual orientation" and "transgender status" to also encompass associated conduct.

85. The Enforcement Document explains that an employee can establish a claim for hostile work environment because of the employee's "protected characteristic" through facially discriminatory conduct, stereotyping, or some combination of context, timing, and comparative evidence. *See id.* at 27-33.

86. With respect to sex-based harassment, the Enforcement Document identifies three routes for establishing causation: "(1) explicit or implicit proposals of sexual activity; (2) general hostility toward members of the complainant's sex [(presumably including sexual orientation or gender identity)]; and (3) comparative evidence showing how the harasser treated persons who shared the complainant's sex compared to the harasser's treatment of those who did not." But the Enforcement Document emphasizes that "these routes are not exclusive." *Id.* at 32-33.

87. The Enforcement Document provides the following example of harassment based on gender identity—nearly identical to the above-referenced example included in the Proposed Guidance—that creates an "objectively hostile work environment":

> Jennifer, a female cashier who is transgender and works at a fast-food restaurant, is regularly and intentionally misgendered by supervisors, coworkers, and customers over a period of several weeks. One of her supervisors, Allison, intentionally and frequently uses Jennifer's prior male name, male pronouns, and "dude" when referring to Jennifer, despite Jennifer's requests for Allison to use her correct name and pronouns. Other managers also intentionally refer to Jennifer as "he" whenever they work together. In the presence of customers, coworkers ask Jennifer questions about her sexual orientation and anatomy and assert that she is not female. After hearing these remarks by employees, customers also intentionally misgender Jennifer and make offensive comments about her transgender status. Based on these facts, which must be viewed in the context of Jennifer's perspective as a transgender individual, Jennifer has

been subjected to an objectively hostile work environment based on her gender identity that includes repeated and intentional misgendering.

*Id.* at 46.

88.     The Enforcement Document also makes clear that employers are liable not only for their own conduct and that of employee supervisors, but they also must police "non-employee" behavior of which the employer has notice, including constructive notice. *See id.* at 60.

89.     Under the Enforcement Document, an employer must take affirmative steps to prevent harassment, including monitoring the workplace and developing "anti-harassment polic[ies], complaint procedures, and training[s]." *Id.* at 67.

90.     The Enforcement Document requires employers with notice of harassing behavior by a non-employee—misgendering, for example—to take corrective actions, potentially requiring the non-employee to vacate the workplace. *Id.* at 60, 76-85.

91.     The Enforcement Document provides this example of non-employee behavior for which an employer may be liable:

> Howard works as a stocker for a company that sells snacks and beverages in vending machines on customers' premises. At a hospital where Howard is assigned to stock the vending machines, he is harassed daily by a hospital employee who knows Howard's schedule and waits at the vending machines for him to arrive. The hospital employee calls him "H*mo Howard," propositions him, and makes lewd and vulgar sexual comments to him every time the hospital employee sees him. Howard reports this harassment to his employer. Although the harasser is not employed by Howard's employer, because Howard's employer is aware of the sex-based harassment, it has a legal obligation to correct the harassment.

*Id.* at 60.

92.     EEOC acknowledged that "commenters [had] contended that … the proposed guidance exceeded the scope of Title VII as interpreted" in *Bostock*. But EEOC denied that "the guidance exceed[s] the scope of the Supreme Court's decision." *Id.* at 92-94.

21

93.     While *Bostock* dealt only with "failing or refusing to hire," EEOC asserted that the Court's reasoning and Title VII's text necessarily protect employees from discrimination on the basis of sexual orientation or gender identity with respect to other "terms, conditions, or privileges of employment." *Id.* at 94.

94.     EEOC also acknowledged *Bostock*'s refusal to address "bathrooms, locker rooms, or anything else of the kind," 590 U.S. at 681. *Id.* at 92. Nevertheless, EEOC cited past administrative appeals decisions and district court cases to determine that misgendering and denying individuals access to sex-segregated spaces that correspond with their gender identity, "viewed in light of the totality of the circumstances, [are] potentially supportive of a hostile work environment claim." *See id.* at 92-94. EEOC's reliance on past Commission decisions is particularly misplaced because those decisions were not interpretations of the portions of Title VII that apply to private and State employers. *Compare* 42 U.S.C. § 2000-e2(a)(1) (applicable to private and State employment) *with id.* § 2000e-16(a) (applicable to federal employment).

95.     EEOC also acknowledged that many "comments addressed free speech and religion-based rights issues," citing *Meriwether*. *Id.* at 95-99. But EEOC stated only that "if a charge is filed with the EEOC raising similar issues, the EEOC will give the decision appropriate consideration." *Id.* at 98.

96.     EEOC otherwise failed to respond to the States' comments.

97.     The Enforcement Document did not have unanimous support among Commissioners, passing by a split vote of 3-2.

98.     Commissioner Lucas, who voted against issuance, issued a statement warning that the Enforcement Document "effectively eliminates single-sex workplace facilities and impinges on women's (and indeed, all employees') rights to freedom of speech and belief." *See* Lucas Statement at 1 (**Exhibit D**). Commissioner Lucas explained that "[i]t is not harassment to

acknowledge" biological sex or the "enduring" differences between men and women. *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.)). She also rejected the Enforcement Document's conclusion that *Bostock* forbids businesses from "draw[ing] distinctions between the sexes in providing single-sex bathrooms or other similar facilities which implicate … significant privacy and safety interests." *Id.* She argued that maintaining sex-segregated spaces has historically been viewed as "exercising reasonable care to *prevent* harassment of female workers," but the Enforcement Document now treats this "reasonable and necessary step to protect women" as "evidence of *harassment* against any biological male who self-identifies as having a female 'gender identity.'" *Id.* (emphases in original).

99.     Commissioner Lucas predicted that "[w]omen in the workplace will pay the price for the Commission's egregious error." *Id.* at 2. And she explained that the women most likely to be adversely impacted by the Enforcement Document are those working in "blue-collar, agricultural, or low-wage service positions." *Id.* Commissioner Lucas warned that "the Commission's new harassment guidance will elevate 'gender identity' over … women's interests." *Id.*

100.     Apart from those objections to the Enforcement Document, Commissioner Lucas noted that EEOC simply lacks authority to issue substantive regulations. She emphasized that Congress granted the EEOC "authority only to issue 'suitable *procedural* regulations' to carry out Title VII." *Id.* n.4 (emphasis added) (quoting 42 U.S.C. § 2000e-12(a)).

101.     Commissioner Lucas acknowledged that the Enforcement Document, like the 2021 Guidance, disclaims having any legal effect. But she stated "[t]hat disclaimer is worth little" because "[a] rule called by any other name is still a rule." *Id.* Indeed, Commissioner Lucas continues, EEOC describes the Enforcement Document as a resource for "employers, employees, and practitioners; for EEOC staff and the staff of other agencies that investigate, adjudicate, or

23

litigate harassment claims or conduct outreach on the topic of workplace harassment; and for courts deciding harassment issues." *Id.* (quoting Enforcement Document). And "the guidance makes clear at its very start [that] it communicates … the agency's enforcement positions." *Id.* (cleaned up).

## PLAINTIFFS' IMPENDING IRREPARABLE HARM

102.     The State of Tennessee employs approximately 43,000 individuals, not including those employed by the State's public institutions of higher education. The other Plaintiffs are also major employers within their states. In total, Plaintiff States employ hundreds of thousands of people.

103.     Because Plaintiff States are employers bound by Title VII's prohibition on discrimination, they are regulated directly by the Enforcement Document. But many of the affirmative gender-identity accommodations required by the Enforcement Document are currently absent from Plaintiff States' employment policies. For example, Tennessee and the other Plaintiff States do not require that employees be allowed to use bathrooms and other sex-segregated spaces that align with their gender identity. In fact, in certain contexts, Tennessee mandates the opposite: Tennessee has made it unlawful for a public school to intentionally allow members of the opposite biological sex to enter multi-occupancy restrooms or changing facilities while other persons are present. *See* Tenn. Code Ann. § 49-2-805(a).

104.     Arkansas, Georgia, Kentucky, Mississippi, Nebraska, and West Virginia maintain similar laws preserving sex-segregated spaces.

105.     Arkansas law requires public schools to designate multiple occupancy restrooms based on biological sex. Multiple occupancy restrooms must be designated for the "exclusive use by the male sex" or the "exclusive use by the female sex." Ark. Code Ann. 6-21-120(b)(1). Arkansas law further provides that public schools sponsoring or supervising an overnight trip

involving students must ensure that students only share sleeping quarters with those of the same sex. *Id.* 6-10-137(a).

106. Georgia law requires that tourist accommodations must have toilet facilities that are "separat[e] for each sex with no interconnection." Ga. Comp. R. & Regs. 511-6-2-.08(14)(a).

107. In Kentucky, schools "have a duty to respect and protect the privacy rights of students, including the right not to be compelled to undress or be unclothed in the presence of members of the opposite biological sex." Ky. Rev. Stat. § 158.189(2)(e). Thus, restrooms and other changing facilities in Kentucky public schools must be segregated by biological sex. *See id.* § 158.189(3), (4).

108. The Mississippi legislature recently adopted a bill—the Securing Areas for Females Effectively and Responsibly Act ("SAFER Act")—that, after being signed by the Governor, will require certain public education buildings to have separate restrooms and changing rooms designated for exclusive use by females and males, or have single-sex or family-use restrooms or changing rooms. *See* S.B. 2753, 2024 Leg. Reg. Sess. (Miss. 2024). That bill recognizes that "[t]here are important governmental reasons to distinguish between the sexes with respect to spaces where biology, safety, and/or privacy are implicated" and that "[f]emales and males should be provided areas, including restrooms, changing facilities and single-sex educational housing spaces, for their exclusive use, respective to their sex, in order to maintain privacy and safety." *Id.* § 2(a), (b).

109. The "Nebraska Equal Opportunity in Education Act does not prohibit any educational institution from maintaining separate toilet facilities, locker rooms, or living facilities for the different sexes." Neb. Rev. Stat. § 79-2,124. Nebraska's Fair Employment Practice Act prohibits employers from discriminating against or harassing employees on the basis of sex, *see id.* § 48-1104, but nothing in the Act requires that employers accommodate an employee's

bathroom preferences based on gender identity, *see id.* § 48-1102(14).  In fact, Nebraska law requires that employers separate certain facilities based on sex, not gender identity.  Nebraska statutes require that "[e]very factory, mill, workshop, mercantile or mechanical establishment or other building" where "male and female" persons are employed together to provide "water closets, earth closets or privies separate and apart . . . for the use of each sex, and plainly so designated, and no person shall be allowed to use such closet or privy assigned to the other sex." *Id.* § 48-401.  Nebraska law also requires the same class of employers to provide "separate dressing rooms . . . for females whenever so required by the [State] Department of Labor" when changing clothes on the jobsite is necessary.  *Id.* § 48-402.

110.  Governor Pillen of Nebraska has established through executive order a Women's Bill of Rights requiring "all state agencies, boards, and commissions" in rulemaking, enforcement, and adjudication to define a person's sex "as his or her biological sex."  The order further states that "[t]here are legitimate reasons to distinguish between the sexes," including in "restrooms[] and other areas where biology, safety, and/or privacy are implicated."  Neb. Exec. Order. No. 23-16 (Aug. 30, 2023), available at https://perma.cc/63F5-5DA3.

111.  West Virginia law provides for sex-separated water closest in workplaces and specifies that "[n]o person or persons shall be allowed to use the closets assigned to the opposite sex."  W. Va. Code Ann. § 21-3-12.  West Virginia also requires that "[s]eperate dressing rooms and washing facilities shall be maintained for each sex" in certain workplaces.  W. Va. Code Ann. § 21-3-13.

112.  Plaintiff States also do not maintain policies or practices requiring employees to use pronouns based on gender identity when referring to others.  In fact, Tennessee expressly *protects* the use of sex-based pronouns in certain contexts.  Tenn Code Ann. § 49-6-5102(b).

Kentucky also expressly protects the use of sex-based pronouns in certain contexts. *See* Ky. Rev. Stat. § 158.191(5)(b).

113.    Arkansas's Given Name Act was enacted to protect the freedom of speech and expression of school faculty and students, and to protect the rights of parents. It prohibits a school employee from addressing a student with (1) a "[p]ronoun or title that is inconsistent" with the student's "biological sex"; or (2) a "[n]ame other than the name listed on the . . . student's birth certificate" or a derivative of that name, unless the school employee "has the written permission" of the student's parent. Ark. Code Ann. 6-1-108(d)(1). The Act further provides that school employees and students shall not be sanctioned for declining to address a person by (1) a name other than that on the person's birth certificate, or (2) a "[p]ronoun or title that is inconsistent with the person's biological sex. *Id.* -108(d)(2).

114.    The Virginia Constitution expressly protects the use of sex-based pronouns in certain contexts. *See Vlaming v. West Point School Bd.*, 895 S.E.2d 705 (Va. 2023). In *Vlaming*, the Supreme Court of Virginia held that a teacher who was terminated by a school board for refusing to violate his religious beliefs by using a transgender student's preferred pronouns stated a legally viable free-exercise claim under the Constitution of Virginia. 895 S.E.2d at 724, 728. Similarly, the teacher stated a legally viable "compelled speech" claim under the Constitution of Virginia. *See id.* at 743.

115.    Plaintiff States also do not maintain policies requiring that employees be allowed to dress in accordance with their gender identity.

116.    Thus, Plaintiff States face a credible threat that EEOC will enforce the Enforcement Document's gender-identity-accommodation mandate against them. *See Tennessee*, 615 F. Supp. 3d at 840-41. The Enforcement Document inflicts significant, irreparable harm on Plaintiffs that only prompt judicial intervention can redress.

117.    *First,* Plaintiff States would suffer the "irreparable harm of nonrecoverable compliance costs." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)); *cf. Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-162-BJB, ---F. Supp. 3d----, 2024 WL 1402443, at *3 (W.D. Ky. Apr. 1, 2024) (noting such costs establish an injury for standing purposes). A critical factor in assessing both hostile-work-environment claims, generally, and employers' vicarious Title VII liability, in particular, is whether the employer has adequate training materials and procedures for reporting unlawful harassment. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 806–09 (1998). Plaintiffs therefore will need to review discrimination policies statewide, revise and reissue policies that conflict with the Enforcement Document, draft new policies, and develop and distribute training and educational materials for supervisors and employees.

118.    *Second*, on top of unrecoverable compliance costs, EEOC's gender-identity-accommodation mandate fundamentally infringes on the sovereignty of the Plaintiff States. Tennessee will be unable to enforce a number of its own laws without coming into conflict with the Enforcement Document. For example, Tennessee gives public school students, teachers, and employees a private right of action for monetary damages against a school that "intentionally allow[s] a member of the opposite sex to enter [a] multi-occupancy restroom or changing facility while other persons were present." Tenn. Code Ann. § 49-2-805(a). Tennessee law also provides that public school teachers and employees are not "[r]equired to use a student's preferred pronoun when referring to the student if the preferred pronoun is not consistent with the student's biological sex." Tenn Code Ann. § 49-6-5102(b); *see also id.* § 49-7-2405 (protecting speech in higher education institutions).

119. EEOC's gender-identity-accommodation mandate also conflicts with a bevy of laws in other Plaintiff States. *See* Ark. Code Ann. 6-1-108 (protecting school employees' right to use biologically correct pronouns); *id.* 6-21-120(b)(1) (requiring multiple occupancy restrooms be designated for the "exclusive use by the male sex" or the "exclusive use by the female sex"); *id.* 6-10-137(a) (requiring public schools sponsoring or supervising an overnight trip involving students to ensure that students only share sleeping quarters with those of the same sex); Ga. Comp. R. & Regs. 511-6-2-.08(14)(a) (requiring that toilet facilities at tourist accommodations be "separat[ed] for each sex with no interconnection"); Ky. Rev. Stat. § 158.189 (requiring sex-segregated "restrooms, locker rooms, or shower rooms" in public schools); *id.* § 158.191 (preserving school employees' right to use biologically correct pronouns); Neb. Rev. Stat. § 79-2,124 (preserving schools' ability to maintain sex-segregated spaces); *id.* §§ 48-401-02 (requiring sex-segregated facilities in certain workplaces); W. Va. Code Ann. § 21-3-12 (similar); *id.* § 21-3-13 (similar).

120. As the court held in *Tennessee*, States have a "sovereign interest[] in enforcing their duly enacted state laws." 615 F. Supp.3d at 841. In light of the conflict between the States' laws and the Enforcement Document, Plaintiffs "will continue to face substantial pressure" to disregard their own laws "in order to avoid material legal consequences." *Id.*; *cf. David Nex Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 657-58 (1999) (Kennedy, J., dissenting) ("[M]any school districts, desperate to avoid Title IX peer harassment suits, will adopt whatever federal code of student conduct and discipline the Department of Education sees fit to impose on them."). And any time "a State is [prevented] from effectuating statutes enacted by representatives of its people," it suffers irreparable harm. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020); *see also Tennessee*, 615 F. Supp. 3d at 841 (collecting cases).

121. Moreover, requiring the Plaintiff States to adopt policies promoting the government's preferred gender ideology unconstitutionally impairs their interests in protecting their messaging with respect to the biological realities of sex and the "enduring" differences between men and women that require specific privacy and safety considerations. *See Otto v. Boca Raton, Florida*, 981 F.3d 854, 863-64 (11th Cir. 2020) (holding unconstitutional ordinances that "codif[ied] a particular viewpoint—sexual orientation is immutable, but gender is not—and prohibit the therapists from advancing any other perspective when counseling clients"); *see also Business Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 978 (8th Cir. 2021) (affirming that university policy was unlawful where student group "was prevented from expressing its viewpoints on protected characteristics while other student groups 'espousing another viewpoint [were] permitted to do so'"); *cf. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) ("With respect to specialty license plate designs, Texas is not simply managing government property, but instead is engaging in expressive conduct."). States have the power "to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety." *Mugler v. Kansas*, 123 U.S. 623, 661 (1887).

122. *Third*, the Enforcement Document would force individual citizens of Plaintiff States to endure a variety of irreversible harms. To name just a few: Employees and customers of both sexes would experience violations of their bodily privacy by individuals of a different sex. *Cf. Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing that "most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating'" (citation omitted)) (collecting cases); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989) ("[E]xcretory function[s are] traditionally shielded by great privacy."). And employees will

suffer harm to their First Amendment free-speech and free exercise rights by being compelled to "speak in ways that align with [EEOC's] view but defy [their] conscience about a matter of major significance." *303 Creative v. Elenis*, 600 U.S. 570, 602-03 (2023). Thus, adopting the policies required by the Enforcement Document would cause Plaintiffs States to violate their employee's First Amendment rights.

**CLAIMS FOR RELIEF**

**CLAIM I**

**Violation of APA, 5 U.S.C. § 706(2)(A), (C)**
**The Enforcement Document is Contrary to Tite VII and**
**Exceeds EEOC's Statutory Authority**

123.    Plaintiffs incorporate by reference all preceding allegations.

124.    EEOC is a federal agency within the meaning of the APA.

125.    The Enforcement Document is a final agency action reviewable under the APA. 5 U.S.C. § 704. It is a "rule" under the APA. *Id.* § 701(b)(2). Although the Enforcement Document disclaims having any legal effect, courts must "consider whether the practical effects of an agency's decision make it final agency action, regardless of how it is labeled." *Tennessee*, 615 F. Supp. 3d at 831 (citation omitted). Here, EEOC's "disclaimer is worth little" because "[a] rule called by any other name is still a rule." *See* Lucas Statement at 2. Like the substantively identical 2021 Guidance, the Enforcement Document "determines the 'rights or obligations' of those subject to Title[] VII." *Tennessee*, 615 F. Supp. 3d at 831.

126.    Plaintiff States lack another adequate remedy to challenge the Enforcement Document in court, and no rule requires that the States appeal to a superior agency authority prior to seeking judicial review.

127.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

128.    The Enforcement Document is not in accordance with law because it expands the scope of Title VII liability beyond what was authorized by Congress. *See U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998) (setting aside regulations beyond statutory authority).

129.    *First*, the Enforcement Document, like the now-vacated 2021 Guidance, fundamentally misconstrues and improperly extends *Bostock* to support its construction of Title VII. *Bostock* only concerned—and thus its holding only addresses—allegations of discriminatory termination. *See* 590 U.S. at 650-51. The Court *explicitly disclaimed* any intent "to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 681. Yet the Enforcement Document relies on *Bostock* to construe conduct like "denial of access to a bathroom or other sex-segregated facility consistent with [an] individual's gender identity" as sex-based discrimination under Title VII.

130.    The Enforcement Document thus requires employers to treat employees of the same sex differently based on the employee's gender identity by mandating accommodations for transgender employees with regard to workplace policies that are not based on gender identity, implausibly preferencing the category of "gender identity" (absent from Title VII) over sex (actually protected under Title VII).

131.    EEOC has effectively rewritten Title VII to create a *de facto* accommodation for gender identity, even though simple recognition of physiological differences between the sexes does not violate Title VII. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

132. Because Congress did not "clearly" authorize EEOC's gender-identity-accommodation regime, EEOC is powerless to resolve the "fraught line-drawing dilemmas" associated with balancing gender-identity accommodations, employee health, welfare, and safety, and freedom of speech, conscience, and religion. *L.W. ex rel Williams v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023); *see West Virginia v. EPA*, 597 U.S. 697, 716 (2022) ("[C]ourts 'expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.'" (citation omitted)).

133. *Second*, the Enforcement Document exceeds EEOC's statutory authority because it is a substantive rule that the Commission is powerless to promulgate.

134. An administrative agency "literally has no power to act … unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quotations omitted).

135. And Congress has only granted EEOC "authority from time to time to issue, amend, or rescind suitable *procedural regulations* to carry out the provisions of [Title VII]." 42 U.S.C. § 2000e-12 (emphasis added).

136. "Congress, in enacting [that statute], did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title." *Gilbert*, 429 U.S. at 141.

137. Thus, EEOC exceeded its statutory authority by expanding Title VII beyond its text and structure in the Enforcement Document. *See Texas*, 633 F. Supp. 3d at 831-36, 840-42.

138. Because the EEOC lacked authority to issue the Current Guidance, it is unlawful and should be "set aside." 5 U.S.C. § 706(2).

## CLAIM II

### Violation of U.S. Constitution and 5 U.S.C. § 706(2)(B)
### The Enforcement Document Violates Federalism, State Sovereignty, and the First Amendment

139.     Plaintiffs incorporate by reference all preceding allegations.

140.     EEOC's Enforcement Document is "contrary to constitutional right [or] power, 5 U.S.C. § 706(2)(B), in multiple independent respects.

141.     *First*, the Enforcement Document transgresses the U.S. Constitution's federalism limits.  "[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government."  *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).  Reflecting this "fundamental principle," *id.*, the Tenth Amendment to the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," U.S. Const. amend. X.  The federal government "may not conscript state governments as its agents," *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 472 (2018), including by "dictat[ing] what a state legislature may and may not do," *id.* at 474.  And while Congress may regulate the States as employers, it cannot do so in a way "that is destructive of state sovereignty."  *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985).  EEOC's Enforcement Document violates these principles by intruding on the States' historic and traditional authority to safeguard privacy expectations in the workplace, strongarming States into promoting and implementing the agency's preference for gender-identity accommodations that conflict with state law.  And it does so without any indication that Congress intended that result.  *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (explaining that Congress must make "clear and manifest" its purpose to supersede historic powers reserved to the States).

142.     *Second*, by subjecting Plaintiff States to damages suits for failing to accommodate employees' gender identity, contrary to state law, the Enforcement Document violates Section 5 of the Fourteenth Amendment.  Congress may abrogate the States' sovereign immunity pursuant to its authority to enforce the Fourteenth Amendment only to remedy violations of the Constitution by the States; it may not substantively redefine a State's constitutional obligations.  *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) (explaining that there "must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end").  But, in enacting Title VII, Congress never identified any pattern of discrimination against employees based on their sexual orientation or gender identity, let alone one that amounted to a constitutional violation.

143.     *Third*, the Enforcement Document violates the First Amendment's protection of free speech and religious liberty.  By purporting to require employers and their employees to convey the Administration's preferred message on controversial gender-identity preferences— for example, requiring the use of pronouns that align with an employee's self-professed gender identity and prohibiting the use of pronouns consistent with that employee's biological sex—the Enforcement Document unconstitutionally compels and restrains speech, even if contrary to the regulated parties' viewpoints.  *See Meriwether*, 992 F.3d at 511-12 (holding university's policy requiring faculty to use students' preferred pronouns violated professor's free-speech rights).  And the Enforcement Document's limits on speech are particularly "egregious" because they are viewpoint-based, requiring employers and their employees to adhere to EEOC's chose gender-ideology orthodoxy.  *See Rosenberger v. Rectors & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-29 (1995).

144.     Requiring that employers and their employees adhere to EEOC's chosen gender-ideology orthodoxy likewise treads on religious freedoms.  Because Title VII provides

exemptions for small employers, it is not "generally applicable," and the Enforcement Document triggers strict scrutiny under free-exercise caselaw. *See Fulton v. City of Philadelphia*, 543 U.S. 522, 540-42 (2021). EEOC's gender-ideology-accommodation mandate impermissibly violates employers' and employees' free-exercise rights. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720-23 (2014). Thus, adopting the policies required by the Enforcement Document would cause Plaintiff States to violate their employee's First Amendment rights.

145.    Accordingly, Plaintiffs seek an order declaring that Title VII cannot constitutionally be read to authorize the Enforcement Document's gender-identity mandate, as well as an order vacating and setting aside the same.

## CLAIM III

### Violation of 5 U.S.C. § 706(2)(A)
### The Enforcement Document is Arbitrary and Capricious

146.    Plaintiffs incorporate by reference all preceding allegations.

147.    The APA's prohibition against arbitrary and capricious agency action requires agency decision-making to be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Thus, an agency must consider "important aspects of the problem," ignore "factors which Congress has not intended it to consider," and "examine the relevant data [to] articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's action is arbitrary and capricious if it "runs counter to the evidence before" the agency. *Id.*

148.    The Enforcement Document is arbitrary and capricious, among other reasons, because EEOC failed to "consider an important aspect of the problem" addressed in the guidance: long-recognized privacy and safety justifications for sex-segregated spaces.

149.    The Enforcement Document also does not account for the difficulty, if not complete inability, of employers to confirm a person's self-professed gender identity.

150. Nor does EEOC adequately—if at all—consider countervailing consequences of the Enforcement Document on the employment prospects of transgender persons or workplace morale and productivity.

151. And EEOC ignored its obligation to consider the federalism implications of the Current Guidance's conflicting with a raft of state laws across multiple States.

152. EEOC's failure to consider these important aspects of the regulatory problem renders its gender-identity mandate arbitrary and capricious under the APA and warrants enjoining and setting aside the Enforcement Document in relevant part.

## CLAIM IV

**Violation of U.S. Constitution and 5 U.S.C. § 706(2)(B)**
**EEOC's Independent Structure Violates Article II and the Separation of Powers**

153. Plaintiffs incorporate by reference all preceding allegations.

154. The Enforcement Document also is "not in accordance with law" and "contrary to constitutional right [or] power," 5 U.S.C. § 706(2)(A)-(B), because the EEOC is unconstitutionally structured.

155. EEOC's putative status as an "independent federal agency" violates Article II's command that vests "'the executive Power'—all of it"—in the President. *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1). As a corollary, the Constitution demands that the President maintain the ability "to remove those who assist him in carrying out his duties." *Id*. at 204 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513-14 (2010)).

156. This requirement of at-will removal applies to all "multimember expert agencies" that "wield substantial executive power." *Id*. at 217-18 (citing *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)). If "an agency does important work," Article II demands its leaders to be removable by the President—full stop. *Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021).

157.    Indeed, courts and EEOC itself have interpreted the agency's governing statute—which provides for five-year terms for Commissioners, 42 U.S.C. § 2000e-4(a)—as allowing removal only for cause, despite the Commission's wielding an array of "quintessentially executive power[s]" that include the authority to issue binding regulations and pursue enforcement actions in federal court on behalf of the United States.  *Cf. Seila Law*, 591 U.S. at 217-18; *see also Collins*, 141 S. Ct. at 1785-86.

158.    EEOC's independent-agency structure thus violates the Constitution, which permits application of removal protections only to those multimember bodies who "perform[] legislative and judicial functions and [are] said not to exercise any executive power."  *Seila Law*, 591 U.S. at 216.  Alternatively, as a matter of constitutional avoidance, this Court should declare that EEOC's organic statute, which provides only for a term-of-years appointment, does not implicitly confer for-cause-removal protection.  *See, e.g.*, *Calcutt v. FDIC*, 37 F.4th 293, 337-39 (6th Cir. 2022) (Murphy, J., dissenting), *rev'd on other grounds by* 598 U.S. 623 (2023) (per curiam).

159.    EEOC's unlawful structure renders its rules unlawful and requires setting aside the Final Rule "as void." *See Seila Law*, 140 S. Ct. at 2196; *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (being subjected to "unconstitutionally insulated" agency decisionmaker is "here-and-now injury").

**CLAIM V**
**Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201 and 5 U.S.C. § 706**
**Claim for Declaratory Judgment**

160.    Plaintiffs incorporate by reference all preceding allegations.

161.    The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate

pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

162.    This case presents an actual controversy.  The Enforcement Document operates on Plaintiff States directly in their capacity as employers, meaning the Enforcement Document's requirements affect Plaintiffs' legal rights and obligations.  Moreover, the imminent enforcement of the Enforcement Document against Plaintiffs would subject them to money damages and other relief for failure to adopt gender-identity accommodations that conflict with state law and policy.

163.    This controversy arises in this Court's jurisdiction, as it relates to questions of federal law.  Venue is proper, as Plaintiff State of Tennessee resides in this District, and the Enforcement Document affects employment operations in this District.  28 U.S.C. § 1391(e).

164.    Through this Complaint, the Plaintiff States have filed an appropriate pleading to have their rights declared.  The Court can resolve this controversy by declaring that Title VII does not authorize EEOC to impose the Enforcement Document's gender-identity accommodation mandates.

## PRAYER FOR RELIEF

An actual controversy exists between the parties that entitles the Plaintiff States to declaratory and injunctive relief.  Plaintiffs request that this Court:

a)    Enter a judgment declaring that the Enforcement Document's gender-identity-accommodation mandate conflicts with Title VII and setting aside the Enforcement Document as unlawful under 5 U.S.C. § 706;

b)    Enter a judgment declaring that EEOC lacked authority to issue the Enforcement Document and setting aside the Enforcement Document as unlawful under 5 U.S.C. § 706;

c)    Enter a judgment declaring that the Enforcement Document's gender-identity-accommodation mandate is invalid under the U.S. Constitution and the APA;

d)       Enter a judgment declaring that the Enforcement Document's gender-identity-accommodation mandate is arbitrary and capricious under the APA and vacating and remanding the Enforcement Document to EEOC pursuant to 5 U.S.C. § 706;

e)       Enter a judgment declaring the Enforcement Document to be *ultra vires* and invalid under the U.S. Constitution and the APA because EEOC's independent commission structure violates Article II and the Separation of Powers and vacating and setting aside the Enforcement Document as unlawful under 5 U.S.C. § 706;

f)       Enter a judgment declaring that Title VII does not prohibit employers from maintaining showers, locker rooms, bathrooms, and other living facilities separated by biological sex or from regulating each individual's access to those facilities based on the individual's biological sex;

g)       Enter a judgment declaring that Title VII does not require an employer or its employees to use a transgender individual's preferred pronouns.

h)       Enter a preliminary injunction enjoining EEOC, DOJ, and any other agency or employee of the United States from enforcing or implementing the Enforcement Document's gender-identity mandate pending this Court's issuance of a Final Judgment on Plaintiffs' claims and/or enter a stay pending review of the Enforcement Document under 5 U.S.C. § 705;

i)       Enter a judgment vacating and setting aside the Enforcement Document as unlawful under 5 U.S.C. § 706 and permanently enjoin EEOC, DOJ, and any other agency or employee of the United States from enforcing or implementing the Enforcement Document's gender-identity mandate; and

j)       Grant any other equitable or nominal relief the Court deems just and proper, as well as reasonable attorneys' fees and the costs of this action.

Dated: May 13, 2024.                     Respectfully submitted,


                                         JONATHAN SKRMETTI
                                           Tennessee Attorney General
                                           and Reporter

                                         /s/ *Whitney D. Hermandorfer*
                                         WHITNEY D. HERMANDORFER
                                           Director of Strategic Litigation
                                         STEVEN J. GRIFFIN
                                           Senior Counsel for Strategic Litigation &
                                           Assistant Solicitor General
                                         HARRISON GRAY KILGORE*
                                           Strategic Litigation Counsel &
                                           Assistant Solicitor General
                                         OFFICE OF THE TENNESSEE
                                           ATTORNEY GENERAL
                                         P.O. Box 20207
                                         Nashville, Tennessee 37202
                                         (615) 741-3491
                                         Whitney.Hermandorfer@ag.tn.gov
                                         Steven.Griffin@ag.tn.gov
                                         Harrison.Kilgore@ag.tn.gov

                                         *Application for admission forthcoming

                                         *Counsel for Plaintiff State of Tennessee*

STEVE MARSHALL
  Attorney General

/s/ *Edmund G. LaCour, Jr.*
EDMUND G. LACOUR, JR.*
  Solicitor General
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Alabama*


TIM GRIFFIN
  Attorney General

/s/ *Nicholas J. Bronni*
NICHOLAS J. BRONNI*
  Solicitor General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@arkansasag.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Arkansas*


TREG TAYLOR
  Attorney General

/s/ *Cori Mills*
CORI MILLS*
  Deputy Attorney General, Civil Division
OFFICE OF THE ALASKA ATTORNEY GENERAL
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501
(907) 465-2132
Cori.Mills@alaska.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Alaska*


CHRISTOPHER CARR
  Attorney General

/s/ *Stephen Petrany*
STEPHEN PETRANY*
  Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF
GEORGIA
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
Spetrany@law.ga.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
  Attorney General

/s/ *James A. Barta*
JAMES A. BARTA*
  Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF
INDIANA
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Indiana*

KRIS W. KOBACH
  Attorney General

/s/ *Abhishek Kambli*
ABHISHEK KAMBLI*
  Deputy Attorney General
OFFICE OF THE KANSAS ATTORNEY GENERAL
120 SW 10th Ave.
Topeka, KS 66612
(785) 296-7109
Abhishek.Kambli@ag.ks.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Kansas*

BRENNA BIRD
  Attorney General

/s/ *Eric H. Wessan*
ERIC H. WESSAN*
  Solicitor General
OFFICE OF THE IOWA ATTORNEY GENERAL
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric.Wessan@ag.iowa.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Iowa*

RUSSELL COLEMAN
  Attorney General

/s/ *Justin D. Clark*
JUSTIN D. CLARK*
  Civil Chief
AARON SILLETTO*
  Executive Director, Office of Civil and
Environmental
KENTUCKY OFFICE OF THE ATTORNEY
GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Justind.Clark@ky.gov
Aaron.Silletto@ky.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff Commonwealth of
Kentucky*

43

LYNN FITCH
  Attorney General

/s/ *Justin L. Matheny*
Justin L. Matheny*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI ATTORNEY
GENERAL
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3825
Justin.Matheny@ago.ms.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming
*Counsel for Plaintiff State of Mississippi*

ANDREW BAILEY
  Attorney General

/s/ *Joshua M. Divine*
JOSHUA M. DIVINE*
  Solicitor General
MISSOURI ATTORNEY GENERAL'S OFFICE
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Josh.Divine@ago.mo.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Missouri*


MICHAEL T. HILGERS
  Attorney General

/s/ *Lincoln J. Korell*
LINCOLN J. KORELL*
  Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF
NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
Lincoln.Korell@nebraska.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Nebraska*

DAVE YOST
  Attorney General

/s/T. Elliot Gaiser
T. ELLIOT GAISER*
  Solicitor General
OFFICE OF THE OHIO ATTORNEY GENERAL
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
Thomas.Gaiser@ohioago.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for the State of Ohio*

44

ALAN WILSON
  Attorney General

/s/ *Thomas T. Hydrick*
THOMAS T. HYDRICK*
  Assistant Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
OF SOUTH CAROLINA
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
Thomashydrick@scag.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of South Carolina*


MARTY J. JACKLEY
  Attorney General

/s/ *Grant M. Flynn*
GRANT M. FLYNN*
  Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 E. Hwy. 14, Suite #1
Pierre, SD  57501
(605) 773-3215
Grant.Flynn@state.sd.us

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of South Dakota*


SEAN REYES
  Attorney General

/s/ *Stanford Purser*
STANFORD PURSER*
  Deputy Solicitor General
UTAH ATTORNEY GENERAL'S OFFICE
160 East 300 South, 6th floor
PO Box 140856
Salt Lake City, UT 84114-0856
(801) 366-0100
Spurser@agutah.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of Utah*


JASON S. MIYARES
  Attorney General

/s/ *Kevin M. Gallagher*
KEVIN M. GALLAGHER*
  Principal Deputy Solicitor General
BRENDAN R. CHESTNUT*
  Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S OFFICE
202 North 9th Street
Richmond, Virginia 23219
(805) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for the Commonwealth of Virginia*

PATRICK MORRISEY
  Attorney General

/s/ *Michael R. Williams*
MICHAEL R. WILLIAMS*
  Principal Deputy Attorney General
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Michael.R.Williams@wvago.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5 forthcoming

*Counsel for Plaintiff State of West Virginia*