# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

STATE OF TENNESSEE, STATE OF ALA-
BAMA, STATE OF ALASKA, STATE OF
ARKANSAS, STATE OF GEORGIA, STATE
OF INDIANA, STATE OF IOWA, STATE
OF KANSAS, COMMONWEALTH OF
KENTUCKY, STATE OF MISSISSIPPI,
STATE OF MISSOURI, STATE OF NE-
BRASKA, STATE OF OHIO, STATE OF
SOUTH CAROLINA, STATE OF SOUTH
DAKOTA, STATE OF UTAH, COMMON-
WEALTH OF VIRGINIA, STATE OF WEST
VIRGINIA,

     *Plaintiffs*,

v.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION; CHARLOTTE A. BUR-
ROWS, in her official capacity as Chair of the
Equal Employment Opportunity Commis-
sion; UNITED STATES DEPARTMENT
OF JUSTICE; MERRICK B. GARLAND, in
his official capacity as Attorney General of the
United States; and KRISTEN CLARKE, in
her official capacity as Assistant Attorney
General for Civil Rights at the United States
Department of Justice,

     *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:24-cv-00224
Judge Charles E. Atchley, Jr.
Magistrate Judge Debra C. Poplin

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A § 705 STAY AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    I.   EEOC issues 2016 guidance interpreting Title VII's reference to sex discrimination to encompass gender identity. ............................................................................ 2

    II.  In *Bostock*, the Supreme Court narrowly holds that Title VII bars terminating employees simply for being homosexual or transgender. ................................... 3

    III. EEOC unlawfully extends *Bostock* without following required procedures. .................. 4

    IV. EEOC renews its gender-identity position after a brief comment period ...................... 5

        A.  EEOC proposes a new enforcement document again interpreting Title VII to impose broad gender-identity mandates. ....................................................... 5

        B.  EEOC promulgates the Enforcement Document. ................................................ 6

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ...................................................................................................................... 8

    I.   Plaintiffs Are Likely to Succeed on the Merits of Their Challenge. ................................. 9

        A.  Plaintiffs' claims are justiciable. ........................................................................ 9

        B.  The Enforcement Document exceeds EEOC's statutory authority ....................... 11

        C.  The Enforcement Document violates the Constitution. ........................................ 19

        D.  The Enforcement Document is arbitrary and capricious. ...................................... 22

    II.  Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief ..................................... 23

    III. An Injunction Will Not Harm EEOC or the Public Interest. ........................................ 25

CONCLUSION ................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*303 Creative LLC v. Elenis,*
     600 U.S. 570 (2023) ................................................................................................ 21, 22

*Abbott v. Perez,*
     585 U.S. 579 (2018) ................................................................................................ 10

*Adams by and through Kasper v. Sch. Bd.,*
     57 F.4th 791 (11th Cir. 2022) (en banc) .............................................. 17, 22, 23

*Adams v. Baker,*
     951 F.3d 428 (6th Cir. 2020) ............................................................................... 25

*Advoc. Health Care Net. v. Stapleton,*
     581 U.S. 468 (2017) ................................................................................................ 13

*Ala. Ass'n of Realtors v. HHS,*
     594 U.S. 758 (2021) ................................................................................................ 16

*Am. Gas Ass'n v. FERC,*
     593 F.3d 14 (D.C. Cir. 2010) .............................................................................. 23

*Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.,*
     766 F.3d 560 (6th Cir. 2014) ............................................................................... 22

*United States ex rel. Att'y Gen. v. Del. & Hudson Co.,*
     213 U.S. 366 (1909) ................................................................................................ 18

*Baldwin v. Dep't of Transp.,*
     EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015) ................... 15

*Bd. of Trustees of Univ. of Ala. v. Garrett,*
     531 U.S. 356 (2001) ................................................................................................ 20

*Berry v. U.S. Dep't of Labor,*
     832 F.3d 627 (6th 2016) ......................................................................................... 9

*Bostock v. Clayton Cnty.,*
     590 U.S. 664 (2020) ........................................................................................ *passim*

*Brannum v. Overton Cnty. Sch. Bd.,*
     516 F.3d 489 (6th Cir. 2008) ............................................................................... 12

*Burwell v. Hobby Lobby Stores, Inc.,*
     573 U.S. 682 (2014) ................................................................................................ 21

Case 3:24-cv-00224-CEA-DCP    Document 33    Filed 05/31/24    Page 3 of 37    PageID #: 383

*Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n,*
  812 F.2d 288 (6th Cir. 1987) ........................................................................ 8

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ..................................................................................... 11

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ............................................................................... 19, 20

*Coal. to Def. Affirmative Action v. Granholm,*
  473 F.3d 237 (6th Cir. 2006) ...................................................................... 25

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008) .................................................................................... 10

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.,*
  274 F.3d 377 (6th Cir. 2001) ...................................................................... 25

*Doe 2 v. Shanahan,*
  917 F.3d 694 (D.C. Cir. 2019) (Williams, J., concurring) ......................... 23

*Doe v. Luzerne Cnty.,*
  660 F.3d 169 (3d Cir. 2011) ....................................................................... 12

*Doe v. Triangle Doughnuts, LLC,*
  472 F. Supp. 3d 115 (E.D. Pa. 2020) ......................................................... 16

*Faragher v. City of Boca Raton,*
  524 U.S. 775 (1998) .................................................................................... 24

*Faulkner v. Jones,*
  10 F.3d 226 (4th Cir. 1993) .................................................................. 20, 22

*Fitzpatrick v. Bitzer,*
  427 U.S. 445 (1976) .................................................................................... 19

*Fortner v. Thomas,*
  983 F.2d 1024 (11th Cir. 1993) .................................................................. 14

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) .................................................................................... 22

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) ...................................................................... 17

*Holloway v. Arthur Andersen & Co.,*
  566 F.2d 659 (9th Cir. 1977) ........................................................................ 2

*Kentucky v. Biden,*
  23 F.4th 585 (6th Cir. 2022) ....................................................................... 24

Case 3:24-cv-00224-CEA-DCP   Document 33   Filed 05/31/24   Page 4 of 37   PageID #: 384

*Kentucky v. Biden,*
    57 F.4th 545 (6th Cir. 2023) .................................................................... 24

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) .................................................................... 11

*Kimel v. Florida Bd. of Regents,*
    528 U.S. 62 (2000)..................................................................................... 20

*Lavern B., Complainant,*
    EEOC DOC 0720130029, 2015 WL 780702 (Feb. 12, 2015) ................. 15

*Lichtenstein v. Hargett,*
    83 F.4th 575 (2023)................................................................................... 22

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................ 9, 10

*Marbury v. Madison,*
    5 U.S. 137 (1803)...................................................................................... 19

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
    584 U.S. 617 (2018) .................................................................................. 22

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2020) ............................................................7, 17, 21

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).................................................................................... 22

*Mount Lemmon Fire Dist. v. Guido,*
    586 U.S. 1 (2018)...................................................................................... 10

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998).............................................................................. 12, 15

*Ondo v. City of Cleveland,*
    795 F.3d 597 (6th Cir. 2015) .................................................................... 20

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
    579 U.S. 115 (2016) .................................................................................. 18

*Sommers v. Budget Mktg., Inc.,*
    667 F.2d 748 (8th Cir. 1982) (per curiam)................................................. 2

*Tennessee v. Lane,*
    541 U.S. 509 (2004) .................................................................................. 20

*Tennessee v. U.S. Dep't of Educ.,*
    615 F. Supp. 3d 807 (E.D. Tenn. 2022).............................................*passim*

*Tennessee v. U.S. Dep't of Educ.*,
No. 22-5807 (6th Cir.) (argued Apr. 26, 2023) .......................................................... 5

*Texas Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248 (1981) ................................................................................................. 13

*Texas v. EEOC*,
633 F. Supp. 3d 824 (N.D. Tex. 2022) .............................................................. *passim*

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019) .................................................................................... 19

*Texas v. United States*,
201 F. Supp. 3d 810 (N.D. Tex. 2016) ....................................................................... 3

*Thompson v. DeWine*,
976 F.3d 610 (6th Cir. 2020) .................................................................................... 23

*Toilet Goods Ass'n, Inc. v. Gardner*,
387 U.S. 158 (1967) ................................................................................................... 9

*Tudor v. Southeastern Oklahoma State Univ.*,
13 F.4th 1019 (10th Cir. 2021) ................................................................................ 16

*Tudor v. Southeastern Oklahoma State Univ.*,
Case No. CIV-15-324, 2017 WL 4849118 (W.D. Okla. Oct. 26, 2017) ................ 16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ................................................................................................... 9

*Ulane v. E. Airlines, Inc.*,
742 F.2d 1081 (7th Cir. 1984) ................................................................................... 2

*United States v. Virginia*,
518 U.S. 515 (1996) ............................................................................................20, 22

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) ..................................................................................... 8

*West Virginia v. EPA*,
597 U.S. 967 (2022) .............................................................................................17, 18

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ......................................................................... 17, 18, 20

**Statutes**

5 U.S.C. § 705 ...............................................................................................2, 8, 25

5 U.S.C. § 706(2)(A) ...................................................................................11, 18

v

5 U.S.C. § 706(2)(B) ........................................................................................... 19

5 U.S.C. § 706(2)(C) ............................................................................ 11, 18, 19

42 U.S.C. § 2000e-2(a)(1) ........................................................................ 1, 2, 16

42 U.S.C. § 2000e-2(e) ...................................................................................... 18

42 U.S.C. §2000e-12(a) ..................................................................................... 19

42 U.S.C. §2000e-16(a) ..................................................................................... 16

42 U.S.C. § 2000e(j) .......................................................................................... 13

Tenn. Code Ann. § 49-2-805(a) ......................................................................... 24

W. Va. Code Ann. § 21-3-12 .............................................................................. 24

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
    (2012) ............................................................................................................ 18

EEOC, Proposed Enforcement Guidance on Harassment in the Workplace, 88
    Fed. Reg. 67,750 (Oct. 2, 2023) ................................................................ 5, 6

E.O. 13132 § 3(c) .............................................................................................. 23

Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021) ................. 4

Fed. R. Civ. P. 65(c) ........................................................................................... 8

Human Rights Campaign, Glossary of Terms ............................................. 15, 23

# INTRODUCTION

Title VII of the Civil Rights Act of 1964 bars employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1). In *Bostock v. Clayton County*, the Supreme Court held that firing an employee "simply for being homosexual or transgender" is actionable "sex" discrimination under Title VII. 590 U.S. 644, 660-61 (2020). But *Bostock* expressly declined to address whether its holding extended beyond the termination context to require gender-identity-based accommodations for "bathrooms, locker rooms, or anything else of the kind." *Id.* at 681. As this Court previously put it, "until the Sixth Circuit or the Supreme Court recognizes … such rights and obligations," they "have not been established under federal law." *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 840 n.17 (E.D. Tenn. 2022).

Federal agencies have nonetheless wielded *Bostock* as a talisman for unilaterally contorting Title VII and other federal anti-discrimination laws to impose their preferred gender-identity regime. Among the latest examples is the Equal Employment Opportunity Commission's ("EEOC" or "Commission") Enforcement Guidance on Harassment in the Workplace[1] ("Enforcement Document"). Under the Enforcement Document, employers who fail to accommodate an employee's preferred bathrooms, dress code, or pronouns are liable for money damages and other relief. States are directly subject to EEOC's new nationwide mandate, along with most private employers. If EEOC's expansive Title VII rewrite sounds familiar, that's because it is: The Enforcement Document largely parrots prior EEOC guidance this Court enjoined as procedurally invalid in 2022.

The Enforcement Document is likewise unlawful, so should meet the same end. Neither Title VII nor *Bostock* authorizes EEOC to require the Enforcement Document's sweeping gender-identity accommodations, particularly from States that generally enjoy sovereign immunity. And the

---

[1] Dkt. #1-2.

Enforcement Document violates the U.S. Constitution by compelling adherence to EEOC's preferred gender-ideology viewpoint above all else, including religious and moral objections. EEOC also flunked basic Administrative Procedure Act ("APA") requirements by failing to adequately account for the public's interests in safety, privacy, or other important bases for sex-segregated workplace policies. The Enforcement Document is unlawful on these bases, plus more.

Plaintiffs—the States of Tennessee, Alabama, Alaska, Arkansas, Georgia, Indiana, Iowa, Kansas, Mississippi, Missouri, Nebraska, Ohio, South Carolina, South Dakota, Utah, West Virginia, and the Commonwealths of Kentucky and Virginia—now seek a stay under 5 U.S.C. § 705 and a preliminary injunction prohibiting Defendants from enforcing the Commission's unlawful guidance. Preliminary relief is necessary to prevent Plaintiff States from suffering substantial and irreparable harms—as this Court previously concluded in enjoining EEOC's prior, similar effort to rewrite Title VII through agency directives. EEOC, by contrast, would suffer no harm from an injunction enforcing the proper scope of Title VII. This Court should stay EEOC's unlawful Enforcement Document as well as enjoin its enforcement against Plaintiff States pending judicial review.

## BACKGROUND

### I.    EEOC issues 2016 guidance interpreting Title VII's reference to sex discrimination to encompass gender identity.

Congress enacted Title VII in 1964 to prohibit discrimination in employment based on an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Congress's "major concern" was ending "race discrimination." *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662 (9th Cir. 1977). But shortly before the House approved the legislation, the word "sex" was added as a floor amendment. *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984). The sex-discrimination prohibition was long understood to address the lack of "equal opportunities for *women*" in employment, *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982) (per curiam) (emphasis added), to "ensure that men and women are treated equally," *Holloway*, 566 F.2d at 663.

2

In May 2016, EEOC published guidance declaring that "sex" in Title VII includes gender identity and transgender status, and covered entities therefore must allow individuals to use the bathrooms, locker rooms, and other intimate facilities that correspond with their internal gender identity. *See* EEOC, Fact Sheet: Bathroom Access Rights for Transgender Employees Under Title VII of the Civil Rights Act of 1964 (May 2, 2016), https://perma.cc/V5K5-LYM6. A broad coalition of States successfully challenged that interpretation of Title VII. *See Texas v. United States*, 201 F. Supp. 3d 810, 815-16 (N.D. Tex. 2016). After the States secured an injunction against EEOC's enforcement of the guidance, the agency withdrew its interpretation without issuing a new one.

## II.     In *Bostock*, the Supreme Court narrowly holds that Title VII bars terminating employees simply for being homosexual or transgender.

Four years later, the Supreme Court took up a narrow question: whether an employer is liable for "sex" discrimination under Title VII for "fir[ing] someone simply for being homosexual or transgender." *Bostock*, 590 U.S. at 651. The Court accepted that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655. And the Court held that Title VII imposes a "but-for" causation standard. *Id.* at 656. Applying this logic, the Court held that Title VII prohibits terminating an individual simply for being homosexual or transgender. According to the Court, an "individual employee's sex plays an unmistakable and impermissible role" in an employer's decision to fire that individual for being homosexual or transgender, which are "not relevant" traits for employment decisions. *Id.* at 660. The Court thus held that "[a]n employer who fires an individual merely for being gay or transgender defies" Title VII. *Id.* at 683.

That was all that the Court decided. The Court explicitly declined to "prejudge" Title VII's application to sex-segregated workplace policies, like "bathrooms, locker rooms, or anything else of the kind." *Id.* at 681. It explained that whether "sex-segregated bathrooms, locker rooms, and dress codes … might or might not qualify as unlawful discrimination … are questions" only "for future cases." *Id.* "The only question" in *Bostock*, the Court emphasized, was "whether an employer who

3

fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.* at 681. And the Court held that the answer is "yes." *Id.* at 683.

## III. EEOC unlawfully extends *Bostock* without following required procedures.

Notwithstanding its explicitly limited holding, President Biden declared that *Bostock*'s analysis changed the meaning of all federal law forbidding sex discrimination: "Under *Bostock*'s reasoning, laws that prohibit sex discrimination … prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021). He therefore directed federal agencies to conduct a review of their policies and positions that either "(i) were promulgated or are administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination" or "(ii) are or may be inconsistent with the policy set forth" in the Executive Order. *Id.* at 7,023-24.

EEOC—or, more accurately, Chair Burrows—thus reupped its earlier failed effort to extend Title VII to new contexts involving employees' gender identities. Acting unilaterally, Chair Burrows issued a "technical assistance document" in June 2021 purporting to reflect EEOC's interpretation of what constitutes discrimination under Title VII in light of *Bostock*. EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), https://perma.cc/9VUB-ZK2P ("2021 Guidance"). The 2021 Guidance extended *Bostock*'s non-discrimination holding to situations the Court had declined to consider. For example, even though the Court "d[id] not purport to address" issues like "dress codes" or "bathrooms," 590 U.S. at 681, the 2021 Guidance relied on *Bostock* to declare that "[p]rohibiting a transgender person from dressing … consistent with that person's gender identity" or "deny[ing] an employee equal access to a bathroom … that corresponds to the employee's gender identity" would constitute sex discrimination under Title VII. While this document would revolutionize workplaces nationwide, EEOC offered the

4

public no opportunity to comment on its expansive understanding of post-*Bostock* liability under Title VII.

Tennessee, joined by nineteen other States, brought procedural and substantive challenges under the APA against the 2021 Guidance, as well as parallel guidance promulgated by the Department of Education that relied on *Bostock* to impose similar requirements under Title IX. *Tennessee*, 615 F. Supp. 3d at 837-40. This Court agreed that "*Bostock* does not require [EEOC's] interpretation[] of Title VII." *Id.* at 833. For this reason, among others, the court concluded the 2021 Guidance should have gone through notice-and-comment procedures. It thus enjoined enforcement of the 2021 Guidance based on EEOC's procedural errors. *See id.* at 838-40. EEOC's appeal from that decision remains pending. *Tennessee v. U.S. Dep't of Educ.*, No. 22-5807 (6th Cir.) (argued Apr. 26, 2023).

A separate district court considering Texas's parallel challenge to the 2021 Guidance reached the same conclusion that the 2021 Guidance was procedurally flawed. *Texas v. EEOC*, 633 F. Supp. 3d 824, 829-36, 842 (N.D. Tex. 2022). But the court *also* held that the guidance was substantively unlawful. It explained that "the non-discrimination holding in *Bostock* [was] cabined to 'homosexuality and transgender *status*,'" and the text of Title VII did not support EEOC's extension of that holding to all "correlated *conduct*." *Id.* at 829-30 (emphases in original). And in any event, the court reasoned, Congress only authorized EEOC to promulgate *procedural* rules. *Id.* at 841-42. Because the 2021 Guidance exceeded EEOC's statutory authority and was procedurally deficient, the court set it aside. *See id.* at 829-30, 847. EEOC declined to appeal, effectively withdrawing the guidance.

## IV. EEOC renews its gender-identity position after a brief comment period.

### A. EEOC proposes a new enforcement document again interpreting Title VII to impose broad gender-identity mandates.

After the 2021 Guidance was set aside, EEOC went back to the drawing board. In October 2023, EEOC proposed a new enforcement document purporting to reflect the Commission's interpretation of what constitutes discrimination under Title VII in certain circumstances. EEOC,

5

Proposed Enforcement Guidance on Harassment in the Workplace, 88 Fed. Reg. 67,750 (Oct. 2, 2023) ("Proposed Enforcement Document"), https://perma.cc/KYA9-Z5RX. The Proposed Enforcement Document was substantively the same as the 2021 Guidance. For example, as before, the Proposed Enforcement Document explained that using a transgender employee's biologically accurate pronouns constitutes harassment based on "gender identity," and it required employers to police "misgender[ing]," even by third parties. EEOC maintained that *Bostock* requires employers to accommodate employees' preferred pronouns, "bathrooms, locker rooms, … dress codes[,] … or anything else of the kind," even if the Court did not say so. 590 U.S. at 681.

This time, EEOC allowed the public thirty days to comment on the Proposed Enforcement Document. *See* 88 Fed. Reg. at 67,750. Tennessee led a coalition of twenty States explaining the statutory, constitutional, and APA flaws with EEOC's proposed interpretation of Title VII. *See* Dkt. #1-3; *see also* Compl. ¶¶ 73-81 (summarizing comments). The States urged EEOC to "make appropriate changes" to the Proposed Guidance "to avoid once more imposing unlawful gender-identity rules on the nation's employers." Dkt. #1-3 at 12 (citation omitted).

### B. EEOC promulgates the Enforcement Document.

Nevertheless, EEOC persisted. On April 29, 2024, EEOC published the Enforcement Document, retaining its gender-identity-accommodation mandate for workplaces.

Citing *Bostock*, the Enforcement Document directs that "[s]ex-based discrimination under Title VII includes employment discrimination based on sexual orientation or gender identity," and thus, "sex-based harassment includes harassment based on sexual orientation or gender identity, including how that identity is expressed." Doc #1-2 at 17. The Enforcement Document sets out allegedly "[h]arassing conduct" based on sexual orientation and gender identity, including:

- using "a name or pronoun inconsistent with [an] individual's known gender identity (misgendering)";

- prohibiting an employee from presenting in a manner that would not "stereotypically be associated with that person's sex"; and

- denying an employee "access to a bathroom or other sex-segregated facility consistent with [an] individual's gender identity."

*Id.*

The Enforcement Document also makes clear that employers are not only liable for "harassing conduct"—e.g., misgendering—directed at an employee by supervisors or other employees in the workplace. According to the Enforcement Document:

- "[h]arassing conduct can affect an employee's work environment even if it is not directed at that employee" or "occurs outside the complainant's presence";

- when the employer becomes aware of "harassing conduct" by a third-party *non-employee*—like customers, suppliers, or delivery drivers—the employer must take "corrective action," from "counseling and … oral warning[s]" to banning the individual from the business; and

- employers may even be liable for conduct "that occurs in a non-work-related context."

*See id.* at 51, 55, 76-85. Thus, employers not only must accommodate their employees' preferred pronouns, dress codes, bathrooms, or locker rooms. They also must police the speech of employees and customers, including by correcting their use of biologically accurate pronouns.

EEOC acknowledged that many commenters, like the States, had "contended that … the proposed guidance exceeded the scope of Title VII as interpreted" in *Bostock*. *Id.* at 92. But EEOC simply denied that charge. *Id.* at 92-93. EEOC also acknowledged that the Enforcement Document raised free speech and religious-based rights concerns under *Meriwether v. Hartop*, 992 F.3d 492, 498-99, 512-13 (6th Cir. 2020), which held that the First Amendment protects students' and faculty's prerogative not to "communicat[e] messages about gender identity [they] believe[] are false," including by using "a pronoun that reflects a student's self-asserted gender identity" rather than sex. *Id.* at 97. But instead of wrestling with *Meriwether*'s holdings, EEOC stated only that "if a charge is filed with the EEOC raising similar issues, the EEOC will give the decision appropriate consideration." *Id.* at 98.

Tennessee, joined by seventeen states, filed this suit to challenge the Enforcement Document as violative of EEOC's statutory authority, the U.S. Constitution, and the APA. Because the Enforcement Document is currently in effect, triggering substantial compliance costs and sovereign harms, Plaintiffs now seek preliminary relief pending this Court's resolution of the case.

## LEGAL STANDARD

Plaintiffs seek a preliminary injunction and interim relief against the Enforcement Document pending review under 5 U.S.C. § 705. Both routes to relief allow a court to "preserve status or rights pending" completion of the proceedings by pausing the effect of an agency action. 5 U.S.C. § 705; *see also* Fed. R. Civ. P. 65(c). Courts consider four factors in determining whether relief is appropriate: "(1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest." *Vitolo v. Guzman,* 999 F.3d 353, 360 (6th Cir. 2021); *see also Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (applying these factors under § 705).

## ARGUMENT

Plaintiffs satisfy the showing for preliminary relief. They have a strong likelihood of success on the merits because the Enforcement Document exceeds EEOC's statutory authority, violates the Constitution, and is not the product of reasoned decision-making. Prohibiting the Enforcement Document's effect pending review would stave off further impending, irreparable harm to Plaintiffs without prejudicing Defendants. And an injunction against EEOC's unlawful arrogation of Title VII authority is in the public's interest.

8

## I. Plaintiffs Are Likely to Succeed on the Merits of Their Challenge.

### A. Plaintiffs' claims are justiciable.

The APA directs that only "final agency action[s]" are subject to judicial review. *Tennessee*, 615 F. Supp. 3d at 829 (citation omitted). Plaintiffs seeking to challenge agency action likewise must have constitutional standing to maintain suit. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Both prerequisites are satisfied here.

**1.** The Enforcement Document is final agency action. "An agency action must generally meet two conditions to be considered 'final' under the APA." *Berry v. U.S. Dep't of Labor*, 832 F.3d 627, 633 (6th 2016). "First, the action must mark the consummation of the agency's decisionmaking process." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citation omitted). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation omitted). Like EEOC's gender-identity mandates in 2016 and 2021, the challenged Enforcement Document satisfies both prongs.

The first requirement of finality is easily satisfied here. *See Tennessee*, 615 F. Supp. 3d at 830; *see also Texas*, 633 F. Supp. 3d at 838-41. Because it was promulgated after formal notice-and-comment, the Enforcement Document cannot fairly be characterized as preliminary, procedural, or intermediate. *See Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162 (1967). Indeed, the purpose of the Enforcement Document—which became effective upon issuance—is to "communicate[] the Commission's position on important legal issues," and to "serve[] as a resource for employers, employees, … EEOC staff[,] and the staff of other agencies." Dkt. #1-2 at 2, 8.

Second, and like EEOC's prior guidance in 2016 and 2021, "legal consequences" will flow from the Enforcement Document. *Hawkes Co.*, 578 U.S. at 599. Like the 2021 Guidance, the Enforcement Document's disclaiming legal effect is an empty promise. *See Tennessee*, 615 F. Supp. 3d at 831; Dkt. 1-4 at 2 (Statement of Commissioner Lucas). The Enforcement Document "purport[s] to

9

speak authoritatively on specific conduct that constitutes discrimination based on sexual orientation and gender identity," *Tennessee*, 615 F. Supp. 3d at 832. *See* Dkt. #1-2 at 1 ("This document addresses how harassment based on … sex … is defined under EEOC-enforced statutes and the analysis for determining whether employer liability is established."). It consolidates and replaces a bevy of EEOC's prior enforcement guidance. Dkt. #1-2 at 1-2. And because the Enforcement Document serves as a resource for "EEOC staff and the staff of other agencies that investigate, adjudicate, or litigate harassment claims … and courts deciding harassment issues," employers who do not comply with its directives risk enforcement actions and potential liability. *Id.* at 8. "Thus, in practical effect," the Enforcement Document "requires employers to comply with its stated positions to avoid liability," placing it in the heartland of final agency actions subject to judicial review. *Tennessee*, 615 F. Supp. 3d at 833.

**2.** Plaintiffs also have standing to sue. To have standing, Plaintiffs must "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008). And Plaintiffs easily satisfy these elements here. As employers, the Enforcement Document regulates Plaintiffs directly. *See Mount Lemmon Fire Dist. v. Guido*, 586 U.S. 1, 5 (2018). "[T]here is ordinarily little question" that the "object of the action … at issue" is injured by the agency's decision, or "that a judgment" setting aside "the action will address" that injury. *Lujan*, 504 U.S. at 561-62. Indeed, Plaintiffs had standing to challenge EEOC's 2021 Guidance, in part, because they were "objects of the challenged guidance." *Tennessee*, 615 F. Supp. 3d at 824.

Just like that earlier guidance, the Enforcement Document "directly interferes with Plaintiffs' sovereign authority to enforce state laws." *Id.* at 823. Plaintiffs "have exercised their sovereign authority to enact laws that 'arguably conflict' with" the guidance, meaning that the EEOC's interpretation of Title VII "threaten[s] [Plaintiffs'] ability to enforce their state laws as written." *Tennessee*, 615

F. Supp. 3d at 822, 825. The inability to enforce their duly enacted laws "inflicts irreparable harm on the State[s]." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Moreover, the steep costs of complying with the Enforcement Document, *see* Decl. of Stephen C. Raymer ¶¶ 11-14 (Exhibit A); Decl. of Paula Vrana ¶¶ 7-1 (Exhibit B); Decl. of Jacob Oliva ¶¶ 10-13 (Exhibit C); Decl. of Al Howell ¶¶ 11-14 (Exhibit D); Decl. of Michael Chopp ¶¶ 9-12 (Exhibit E); Decl. of Kelly Hardwick ¶¶ 11-13 (Exhibit F); Decl. of Sean Davis ¶¶ 11-14 (Exhibit G); Decl. of Michael Rodgers ¶¶ 11-14 (Exhibit H); Decl. of Jennifer Meyer ¶¶ 10-12 (Exhibit I); Decl. of Janet Lawson ¶¶ 10-13 (Exhibit J); Decl. of Mark D. Scott ¶¶ 12-14 (Exhibit K), inflict further injury on Plaintiffs "for purposes of Article III" standing. *See Kentucky v. Yellen*, 54 F.4th 325, 342-43 (6th Cir. 2022). Thus, "Plaintiffs were injured by the mere issuance of the challenged guidance." *Tennessee*, 615 F. Supp. 3d at 825.

These injuries to Plaintiffs' sovereign interests and State coffers "stem directly from Defendants' interpretation[] of Title[] VII . . . as expressed in the challenged guidance." *Id.* In other words, Plaintiffs' injuries are traceable to EEOC's actions. *Id.* And Plaintiffs' claims are also redressable because "the requested injunctive and declaratory relief would bar the effect of Defendants' interpretations and reduce the harm alleged." *Id.* Thus, Plaintiffs have Article III standing.

### B. The Enforcement Document exceeds EEOC's statutory authority.

EEOC's "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). The question here, then, is whether EEOC "has stayed within the bounds of its statutory authority" by interpreting Congress's prohibition on "sex" discrimination to require that employers accommodate transgender employees' preferred bathrooms, dress code, and pronouns. *Id.* (emphasis removed). The answer is no. Title VII's bar on sex discrimination does not outlaw longstanding policies that vindicate workplace privacy or recognize the biological differences between the sexes. And EEOC's sweeping contrary expansion of Title VII exceeds the agency's limited license to adopt procedural rules. For either or both reasons, EEOC's contrary

11

interpretation should be "set aside" as exceeding "statutory jurisdiction [or] authority," or being "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

### 1. The Enforcement Document contravenes Title VII.

**1.** Title VII's rule against sex discrimination does not prohibit employers' longstanding practice of maintaining sex-separated facilities like bathrooms, locker rooms, and changing areas. Such policies simply administer the "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex" that Title VII "does not reach." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). And they do so in a way that advances States' important and compelling interests in protecting privacy. *See, e.g.*, *Doe v. Luzerne Cnty.*, 660 F.3d 169, 176-77 (3d Cir. 2011) ("[Individuals] have "a constitutionally protected privacy interest in [their] partially clothed body," and this "reasonable expectation of privacy" is "particularly" strong "while in the presence of members of the opposite sex."); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) (similar).

Maintaining sex-segregated spaces, moreover, is not discriminatory because it treats similarly situated individuals the same: all men must use male facilities, and all women must use female facilities, and all facilities are generally equal. So, for example, a female employee who self-identifies as male and is required to use the women's restroom is treated no "worse than other[]" female employees. *Bostock*, 590 U.S. at 657. Nor is that employee similarly situated to male employees—as is required to show discrimination—for purposes of using the male restroom. And that same logic applies to sex-based dress codes and pronoun usage. Such policies do not treat any "individual worse than others who are similarly situated" "because of sex," *id.*, as each recognizes the "genuine but innocuous differences" between the sexes without preferencing one sex or distinguishing between members of the same sex. *Oncale*, 523 U.S. at 81. EEOC's contrary understanding would implausibly preference the category of "gender identity" (absent from Title VII) over sex (actually protected under Title VII).

12

The simple recognition of sex-based differences reflected in pronoun usage or sex-segregated bathrooms thus does not violate Title VII. If anything, EEOC's view would require employers to treat transgender employees *more* favorably than other employees by accommodating each transgender employee's self-professed concept of gender identity without regard for other employees' safety, privacy, or First Amendment interests. But Title VII demands that workplaces be free from discrimination, not replete with "preferential treatment" to particular employees. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981). Indeed, Congress knew how to require accommodations for certain classes in Title VII, *see, e.g.*, 42 U.S.C. § 2000e(j) (mandating religious accommodations), and has thus far declined to do so based on persons' gender identities. Congress's failure to adopt this "ready alternative" of requiring transgender-based accommodations indicates that Congress did not in fact want what EEOC claims. *Advoc. Health Care Net. v. Stapleton*, 581 U.S. 468, 477 (2017).

**2.** *Bostock* does not require otherwise. There the Court was only concerned with—and thus its holding only addresses—allegations of discriminatory termination. *See* 590 U.S. at 651. The Court "d[id] not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 681. But the Court "*presume[d]* there will be Title VII cases where the protected class 'sex' may not reach particular conduct." *Texas*, 633 F. Supp. 3d at 834. For that reason, courts uniformly rejected EEOC's argument that *Bostock* supported the Title VII analysis in the 2021 Guidance. *See Tennessee*, 615 F. Supp. 3d at 833 ("*Bostock* does not require [EEOC's] interpretation[] of Title VII…."); *Texas*, 633 F. Supp. 3d at 840 ("Title VII—as interpreted in *Bostock*—does not require [dress-code, bathroom, and pronoun] accommodations.").

The Enforcement Document concedes that "*Bostock* itself concerned allegations of discriminatory discharge" but claims that "the Supreme Court's reasoning in the decision … logically extends" to other employment activities, like bathroom and pronoun policies. Dkt. #1-2 at 110. Not so. The Court in *Bostock* proceeded "on the assumption that 'sex' signified . . . biological distinctions between

13

male and female." 590 U.S. at 655. Thus, it did not redefine "sex" in Title VII to encompass gender identity. *Id.* at 669 ("[H]omosexuality and transgender status are distinct concepts from sex."). The Court merely held that employment decisions "based on homosexuality or transgender status necessarily entails discrimination based on sex." *Id.* But while "[a]n individual's homosexuality or transgender status is not relevant to employment decisions," *id.* at 660, the biological differences that define "sex" are the core basis for things like sex-segregated bathrooms, *see Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing that "most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating'" (citation omitted)) (collecting cases).

Ultimately, *Bostock*'s sex-means-sex logic *confirms* that separate bathrooms and changing facilities for men and women are lawful. *Bostock*'s core holding is that firing an employee because they are homosexual or transgender discriminates against that employee, because it treats that individual worse than others who are similarly situated. *See* 590 U.S. at 669. But as discussed, *supra* 12, that is not the case with maintaining sex-segregated spaces. Indeed, counsel for the plaintiffs in *Bostock* agreed that such policies do not run afoul of Title VII because those policies do not subject any individual "to a disadvantage" and are thus "not discriminatory." *See* Tr. Of Oral Arg. at 12-13, *Bostock v. Clayton Cnty.*, 590 U.S. 664 (2020) (Nos. 17-1618, 17-1623) ("[W]hat [Title VII] means when it says 'discriminate against' is to cause an injury[,] and requiring people generally to use separate bathrooms is not an injury."); *see* Reply Br. for Pet'r at 23, *Bostock v. Clayton Cnty.*, 2019 WL 4464221, at *23 ("Sex-specific dress, bathroom, fitness, or other policies may be justified as bona fide occupational qualifications … , and they may not even be discriminatory at all because they do not constitute '*disadvantageous* terms or conditions of employment.'" (quoting *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 118-19 (2d Cir. 2018)).

EEOC, if anything, "misread[s] *Bostock* by melding 'status' and 'conduct' into one catchall

14

protected class covering all conduct correlating to 'sexual orientation' and 'gender identity.'" *Texas*, 633 F. Supp. 3d at 831. The Court only addressed "homosexuality" and "transgender status," *Bostock*, 590 U.S. at 669—which are distinct concepts from "sexual orientation" and "gender identity" in important ways. For example, transgender status, as *Bostock* understood it, is "inextricably bound up with sex" such that treating a transgender person differently "penalizes a person identified as male at birth for traits or actions … tolerate[d] in an employee identified as female at birth." *Id.* at 660. Gender identity, by contrast, is much more expansive and includes many identities that fall entirely outside the biological binary of male and female. *See, e.g.*, HRC Glossary ("Non-binary people may identify as being both a man and a woman, somewhere in between, or as falling completely outside these categories.").[2] Such nonbinary identities are not "inextricably bound up with sex" in the way *Bostock* cast transgender status—further undercutting *Bostock*'s applicability here.

Nor is all conduct associated with sexual orientation or transgender status inextricably bound up with sex. *See Texas*, 633 F. Supp. 3d at 831-33. Again, *Bostock* "*presumes* there will be Title VII cases where the protected class 'sex' may not reach particular conduct," *id.* at 834, and the Court declined to extend protections for things that only "are related to sex in some vague sense." *Bostock*, 590 U.S. at 661; *see also id.* at 694-95 (Alito, J., dissenting). After all, Title VII "requires neither asexuality nor androgyny in the workplace." *Oncale*, 523 U.S. at 81. *Bostock* does not support the contrary position, as the Court's only mention of accommodations associated with conduct—like bathroom usage—was in declining to consider them. 590 U.S. at 681.

**3.** Nor can EEOC draw support from the decisions it cites beyond *Bostock*. For starters, only the U.S. Supreme Court's construction of Title VII is authoritative, as EEOC concedes. *See Lavern B., Complainant*, EEOC DOC 0720130029, 2015 WL 780702, at *11 (Feb. 12, 2015) ("[I]n the federal sector, federal district and circuit court decisions may be persuasive or instructive, but are not binding

---

[2] Human Rights Campaign, Glossary of Terms, https://perma.cc/4UYM-ZW3Q.

on the Commission."). By definition, then, EEOC's own administrative decisions "are not binding authority and cannot be considered definitive interpretations of Title VII."[3] *Tennessee*, 615 F. Supp. 3d at 840 n.17. And while courts "may rely on EEOC decisions as persuasive authority," the persuasiveness of such decisions is diminished when, as here, they pertain to federal employers, which are subject to a different statutory standard than private or state employers. *Compare* 42 U.S.C. §2000e-16(a) (applicable to federal employment) *with* 42 U.S.C. §2000e-2(a)(1) (applicable to private and State employment). Thus, none of the authorities that EEOC relies on outside of *Bostock* to support its expansion of Title VII liability is binding.

Nor are EEOC's cited cases persuasive on their own terms. Consider *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115 (E.D. Pa. 2020). There, the district court merely held that the plaintiff's alleged pattern of harassment stated a claim for a hostile work environment under Title VII. *Id.* at 129-30. Although misgendering and bathroom use were among the many allegations of harassment, it is not clear that those allegations governed the court's determination that the Complaint stated a claim under Title VII. *See id.* The same is true of *Eller v. Prince George's County Public Schools*, where the alleged harassment also included comments that were "explicitly sexual in nature," like threats of "rape." 580 F. Supp. 3d 154, 172 (D. Md. 2022). The decision in *Tudor v. Southeastern Oklahoma State Univ.*, Case No. CIV-15-324, 2017 WL 4849118, at *1 (W.D. Okla. Oct. 26, 2017), is of a piece. The court in *Tudor* noted long-standing restrictions on bathroom use and extensive misgendering among multiple factors by which it determined a jury could find harassment. 2017 WL 4849118, at *1. But that theory was ultimately rejected by a jury. *See Tudor v. Southeastern Oklahoma State Univ.*, 13 F.4th 1019, 1027 (10th Cir. 2021). These are "wafer-thin reed[s] on which to rest" the "sweeping" requirements imposed by the Enforcement Document. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765

---

[3] *See, e.g.*, Doc #1-2 at 110 (citing *Lusardi v. McHugh*, EEOC Appeal No. 0120133395, 2015 WL 1607756, at *10-13 (Apr. 1, 2015)), *Baldwin v. Dep't of Transp.*, EEOC Appeal No. 0120133080, 2015 WL 4397641, at *5, *10 (July 15, 2015).

16

(2021).

EEOC's strained reliance on other cited cases is no more helpful to its position. In *Versace v. Starwood Hotels & Resorts Worldwide, Inc.*, the court only *assumed* that alleged misgendering *might* violate Title VII on the way to concluding that the conduct was not sufficiently pervasive to support a violation. No. 6:14-CV-1003, 2015 WL 12820072, at \*7 (M.D. Fla. Dec. 7, 2015). In *Parker v. Strawser Constr., Inc.*, the court made a single reference to misgendering in recounting the factual background and never returned to it when performing a Title VII analysis. 307 F. Supp. 3d 744, 748 (S.D. Ohio 2018).

Title IX caselaw also cannot sustain EEOC's flawed reading of Title VII for at least two reasons. "Differences between the language of the statute[s] … supply an initial reason why one test does not apply to the other." *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023). Indeed, the "principles announced in the Title VII context [do not] automatically apply in the Title IX context." *Meriwether*, 992 F.3d at 510 n.4; *see Bostock*, 590 U.S. at 681. And in any event, there is no consensus among the federal circuits that denial of access to a bathroom consistent with one's gender identity is sex discrimination under Title IX. *Compare, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 616-17 (4th Cir. 2020) *with Adams by and through Kasper v. Sch. Bd.*, 57 F.4th 791, 811-15 (11th Cir. 2022) (en banc). It is unreasonable to ground new, expansive liability under Title VII in an unsettled interpretation of a different statute.

Ultimately, whatever limited authority EEOC can cobble together for its interpretation of Title VII, "until the Sixth Circuit or the Supreme Court recognizes … that Title VII prohibits discrimination based on sexual orientation and gender identity with respect to bathrooms, locker rooms, and dress codes[,] such rights and obligations have not been established under federal law." *Tennessee*, 615 F. Supp. 3d at 840 n.17. And that has not happened. Like the 2021 Guidance, the Enforcement Document "advance[s] *new* interpretations" of Title VII and "impose[s] *new* legal obligations." *Id.* at 833.

17

4. The major questions doctrine and the significant constitutional flaws with EEOC's Enforcement Document put to bed any doubt that EEOC has exceeded its statutory authority. The Enforcement Document purports to resolve questions "of vast economic and political significance" by requiring the restructuring of workplaces across the nation. *West Virginia v. EPA*, 597 U.S. 967, 716 (2022). If *Bostock*'s termination-limited holding is undeniably "an elephant," 590 U.S. at 680, the expansive liability under the Enforcement Document is a blue whale. And such massive authority is not hidden "in mouseholes." *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 127 (2016) (citation omitted). Rather, EEOC "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723. Yet nothing in Title VII purports to authorize the Commission's nationwide gender-identity-accommodation regime. Indeed, the statute's text signals in the other direction. *See, e.g.*, 42 U.S.C. § 2000e-2(e) (allowing certain businesses "to admit or employ any individual … on the basis of … sex" where "sex … is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business"). It is thus up to clearly expressed "legislative action," not an unelected and unaccountable EEOC, to resolve the "fraught line-drawing dilemmas" associated with balancing gender-identity accommodations, employee health, welfare, and safety, and freedom of speech, conscience, and religion. *L.W.*, 83 F.4th at 486-87.

As discussed, *see infra* p. 19-22, EEOC's Enforcement Document also raises grave constitutional problems under the First Amendment and Section 5 of the Fourteenth Amendment. And "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 247 (2012) ("A statute should be interpreted in a way that avoids placing its constitutionality in doubt."). The constitutional-doubt canon thus forecloses the Enforcement Document's unprecedented expansion of Title VII. It should

18

be set aside as exceeding EEOC's "statutory jurisdiction [or] authority," or being "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

### 2. The Enforcement Document exceeds EEOC's authority to issue procedural rules.

EEOC's Enforcement Document also exceeds the agency's limited rulemaking power. Congress has authorized EEOC to adopt only "*procedural regulations* to carry out the provisions of" Title VII. 42 U.S.C. §2000e-12(a) (emphasis added). EEOC "may not promulgate substantive rules." *Texas v. EEOC*, 933 F.3d 433, 439 (5th Cir. 2019) ("*Texas II*"). Yet, by expanding rather than implementing Title VII, EEOC's new guidance is a substantive rule because it alters employers' obligations under the statute, just like the 2021 Guidance did. *See Tennessee*, 615 F. Supp. 3d at 832; *see also Texas*, 633 F. Supp. 3d at 840. Because "Title VII and precedent confirm that EEOC lacks authority to promulgate substantive rules," the Enforcement Document is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C). *See Texas II*, 933 F.3d at 451.

### C. The Enforcement Document violates the Constitution.

Agency action that is "contrary to constitutional right [or] power" must be set aside. 5 U.S.C. § 706(2)(B). Here, the Enforcement Document violates the Constitution in at least two ways. *First*, the Enforcement Document's directives would unlawfully abrogate Plaintiffs' sovereign immunity. *Second*, the Enforcement Document improperly compels employers and their employees to convey EEOC's preferred gender-ideology viewpoint, violating core First Amendment freedoms.

**1.** As applied to the States, EEOC's interpretation of Title VII exceeds Congress's and the agency's power to abrogate state sovereign immunity. The Constitution vests Congress with "defined[] and limited" legislative powers. *See Marbury v. Madison*, 5 U.S. 137, 176 (1803). Among them, Congress may in limited cases abrogate States' sovereign immunity—and thus subject States to private suit—using its power to enforce the Fourteenth Amendment's guarantees.

Congress has applied liability under Title VII against the States pursuant to its authority under

19

Section 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447 (1976). But Congress may abrogate the States' sovereign immunity pursuant to its Section 5 authority only to remedy violations of the Constitution by the States; it may not redefine a State's constitutional obligations. *See City of Boerne v. Flores*, 521 U.S. 507, 519-20 (1997). There "must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520.

Whether a statute is "congruent and proportional" to the specific class of violations at issue depends on the nature of the relevant constitutional right and the identified history of violations. *See Tennessee v. Lane*, 541 U.S. 509, 522, 529-30 (2004). Congress has a wider berth to craft remedies vindicating fundamental rights that are subject to heightened scrutiny. *See id.* at 531-33. But when non-fundamental rights are at stake, Congress must draft focused statutes grounded in a comprehensive legislative record. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 369-70 (2001).

Here, neither the Supreme Court nor the Sixth Circuit has recognized sexual orientation or transgender status as a suspect classification. *See L.W.*, 83 F.4th at 486; *Ondo v. City of Cleveland*, 795 F.3d 597, 608-10 (6th Cir. 2015). And Congress, for its part, has never identified any pattern of discrimination against transgender individuals by the States, let alone determined that maintaining longstanding policies like sex-segregated bathrooms amounts to a constitutional violation. Congress thus "had no reason to believe that broad prophylactic legislation was necessary in this field." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91 (2000).

Subjecting States to private suits for failing to provide special accommodations for employees based on gender identity therefore exceeds the federal government's power under Section 5. Because the Supreme Court has never recognized transgender individuals as classifications that are subject to heightened scrutiny, States may differentiate on those bases so long as it is rationally related to a sovereign interest. And, of course, States have an interest in protecting their citizens' privacy and safety. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996); *Faulkner v. Jones*, 10 F.3d 226, 232 (4th

20

Cir. 1993). EEOC's Enforcement Document is thus "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532. EEOC's unconstitutional attempt to abrogate Plaintiffs' sovereign immunity either requires invalidating the Enforcement Document outright, or it should counsel reading Title VII more narrowly to avoid this constitutional defect. *See supra* p. 17-18.

**2.** On top of all this, compelling adherence to EEOC's preferred gender-ideology viewpoint would force States to violate the First Amendment rights of their employees. If there is "'any fixed star in our constitutional constellation,' it is the principle that the government may not interfere with 'an uninhibited marketplace of ideas.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584-85 (2023) (citations omitted); *see also id.* at 584 ("[T]he freedom of thought and speech is 'indispensable to the discovery and spread of political truth.'") (quoting *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring)). The Enforcement Document tramples on this lodestar constitutional principle by dictating how employers and their employees must view and speak about controversial gender-identity topics.

Just consider EEOC's threat of liability for employers who use only biologically correct pronouns that conflict with a person's gender identity (or who fail to police customers who do so). The Sixth Circuit has held that governments may not force individuals to convey agreement with the controversial message that sex stems from something other than biology. *See Meriwether*, 992 F.3d at 507-11 (holding university's policy requiring faculty to use students' preferred pronouns violated professor's free-speech rights). Yet the Enforcement Document would compel employers to convey exactly that message by promulgating written policies, training materials, a compliance procedure, and a monitoring program affirming gender ideology, all of which the employer's employees must follow.

The Enforcement Document trenches on religious freedoms, too. Whether under the First Amendment or the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq., EEOC's

21

gender-ideology accommodation mandate would impermissibly violate employers' and employees' free-exercise rights. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 719-21 (2014). And because the law exempts small employers, it is not "generally applicable" and therefore triggers strict scrutiny under free-exercise caselaw. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). But EEOC cannot satisfy that "rigorous test," *Lichtenstein v. Hargett*, 83 F.4th 575, 597 (2023), because guarding individuals from offense is not a compelling sovereign interest. *See, e.g., 303 Creative*, 600 U.S. at 595; *see also Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) ("[I]t is not, as the Court has repeatedly held, the role of the State or its officials to prescribe what shall be offensive."). And EEOC's sweeping approach is not "narrowly tailored" to address that interest. *Lichtenstein*, 83 F.4th at 597.

### D. The Enforcement Document is arbitrary and capricious.

An agency action must stem from "reasoned decisionmaking," or else it will be set aside as "arbitrary and capricious." *See Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 560, 567 (6th Cir. 2014) (citation omitted). Thus, in crafting a rule, an agency may not "rel[y] on factors which Congress has not intended it to consider" or "entirely fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Yet here, EEOC promulgated its Enforcement Document without accounting for key aspects of sex-segregated workplace policies.

EEOC, for instance, failed to consider or address the long-recognized privacy and safety justifications for sex-segregated spaces. Courts have repeatedly recognized the value in, and sometimes the necessity of, private, sex-segregated spaces. *See, e.g., Virginia*, 518 U.S. at 550 n.19; *Adams*, 57 F.4th at 804; *Faulkner*, 10 F.3d at 232. Maintaining these spaces, like restrooms and changing facilities, reduces the potential for harassment, voyeurism, or even violent crime, particularly against women. *See Virginia*, 518 U.S. at 533 (recognizing the "enduring" "[p]hysical differences between men and

22

women."); Brief for the Women's Liberation Front as *Amicus Curiae* 9, *Adams*, 57 F.4th 791 (arguing that allowing men in women's private spaces "inherently threatens women's physical safety in the places previously preserved exclusively for women and girls"). Yet EEOC disregarded these justifications when issuing its Enforcement Document prohibiting such spaces.

EEOC also ignored the heavy implementation burdens that the Enforcement Document places on employers. It is near impossible for employers to discern and verify gender identity. After all, "the transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)." *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring). Even more vexing, gender identity is not fixed, as some individuals may "embrace a fluidity of gender identity," or "may identify as being both a man and a woman, somewhere in between, or as falling completely outside these categories." *See, e.g.*, HRC Glossary, https://perma.cc/4UYM-ZW3Q. Holding employers liable for unknowable, unverifiable, and in some cases oft-changing traits is unsustainable. It also raises serious concerns about employers' ability to maintain workplace morale and threatens the customer-business relationship. It was arbitrary and capricious for EEOC to consider none of these countervailing consequences. *See, e.g.*, *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19-20 (D.C. Cir. 2010).

Finally, the Enforcement Document does not account for its disruption to our federal system. Plaintiff States have enacted laws that cannot co-exist with the Enforcement Document. Comp. ¶¶ 103-14 (identifying conflicting state laws). Indeed, this Court recognized this conflict in invalidating EEOC's earlier guidance. *See Tennessee*, 615 F. Supp. 3d at 822, 840-41. Yet EEOC ignored this "[i]ntrusive federal oversight of State administration." E.O. 13132 § 3(c) (requiring that agencies consider federalism implications of a rule).

## II.   Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief.

As with the prior EEOC guidance, Plaintiffs will suffer irreparable harm if EEOC's

Enforcement Document remains in effect pending review.

*First*, the Enforcement document harms Plaintiffs' "sovereign interests in enforcing their duly enacted laws." *Tennessee*, 615 F. Supp. 3d at 840-41; *see also Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020). Plaintiffs "have exercised their sovereign authority to enact laws that 'arguably conflict'" with the Enforcement Document. *Tennessee*, 615 F. Supp. 3d at 822. For example, Tennessee has made it unlawful for a public school to intentionally allow members of the opposite biological sex to enter multi-occupancy restrooms or changing facilities while other persons are present. *See* Tenn. Code Ann. § 49-2-805(a). And West Virginia law provides for sex-separated water closets in workplaces and specifies that "[n]o person or persons shall be allowed to use the closets assigned to the opposite sex." W. Va. Code Ann. § 21-3-12. "Absent an injunction, Plaintiff States' ability to enforce their conflicting state laws will remain hampered, and Plaintiffs will continue to face substantial pressure to change their state laws in order to avoid material legal consequences." *Tennessee*, 615 F. Supp. 3d at 841. The underlying safety, privacy, and liberty interests these laws and policies are designed to protect will also be harmed.

*Second*, complying with the Enforcement Document will also drain Plaintiffs' coffers. A critical factor in assessing both hostile-work-environment claims, generally, and employers' vicarious Title VII liability, in particular, is whether the employer has adequate training materials and procedures for reporting unlawful harassment. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 806-09 (1998). Plaintiffs therefore will need to review discrimination policies statewide, revise and reissue policies that conflict with the Enforcement Document, draft new policies, and develop and distribute training and educational materials for supervisors and employees. *See* Raymer Decl. ¶¶ 11-14; Vrana Decl. ¶¶ 7-1; Oliva Decl. ¶¶ 10-13; Howell Decl. ¶¶ 11-14; Chopp Decl. ¶¶ 9-12; Hardwick Decl. ¶¶ 11-13; Davis Decl. ¶¶ 11-14; Rodgers Decl. ¶¶ 11-14; Meyer Decl. ¶¶ 10-12; Lawson Decl. ¶¶ 10-13; Scott Decl. ¶¶ 12-14. And even if Plaintiffs ultimately manage to have the Enforcement Document

24

invalidated, they cannot recover money damages from the federal government. *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022) ("[T]he APA does not waive federal sovereign immunity from money-damages claims."). Such "unrecoverable compliance costs" are thus irreparable harm. *Kentucky v. Biden*, 57 F.4th 545, 555-56 (6th Cir. 2023).

## III.     An Injunction Will Not Harm EEOC or the Public Interest.

A preliminary injunction would not harm Defendants. "The point of a preliminary injunction is to maintain 'the status quo' until the resolution of the case 'on its merits.'" *Adams v. Baker*, 951 F.3d 428, 429 (6th Cir. 2020). And Defendants will suffer no harm from sticking to the status quo. They can continue enforcing actual violations of Title VII's non-discrimination provisions. But Defendants have no valid interest in supplementing that enforcement with their unlawful gender-identity interpretation of Title VII that mandates fundamental changes to Plaintiff States' workplaces and by employers across the country. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment[.]").

At bottom, "the public interest lies in a correct application" of the law. *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (citation omitted). Thus, Plaintiffs' substantial showing that the Enforcement Document suffers from statutory, constitutional, and APA flaws tips this factor toward granting a preliminary injunction. And that is to say nothing of the public's interests in safety and privacy, the protections afforded by the First Amendment, and the enforcement of State laws reflecting the will of the people—each of which would be advanced by an injunction against the Enforcement Document. Thus, injunctive relief is in the public interest.

## CONCLUSION

For all these reasons, this Court should grant Plaintiffs' motion for a § 705 stay and preliminary injunction.

Respectfully submitted,

JONATHAN SKRMETTI
  Tennessee Attorney General and Reporter

*/s/ Steven J. Griffin*
WHITNEY HERMANDORFER
  Director of Strategic Litigation
STEVEN J. GRIFFIN
  Senior Counsel for Strategic Litigation
HARRISON GRAY KILGORE*
  Strategic Litigation Counsel and
  Assistant Solicitor General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Whitney.Hermandorfer@ag.tn.gov
Steven.Griffin@ag.tn.gov
Harrison.Kilgore@ag.tn.gov
*Application for admission pending*

*Counsel for Plaintiff the State of Tennessee*

STEVE MARSHALL
  Attorney General

/s/ *Edmund G. LaCour, Jr.*
EDMUND G. LACOUR, JR.*
  Solicitor General
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov
*Counsel for Plaintiff State of Alabama*

TREG TAYLOR
  Attorney General

/s/ *Cori Mills*
CORI MILLS***
  Deputy Attorney General, Civil Division
OFFICE OF THE ALASKA ATTORNEY GENERAL
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501
(907) 465-2132
Cori.Mills@alaska.gov
*Counsel for Plaintiff State of Alaska*

26

TIM GRIFFIN
  Attorney General

/s/ Nicholas J. Bronni
NICHOLAS J. BRONNI*
  Solicitor General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@arkansasag.gov
*Counsel for Plaintiff State of Arkansas*


THEODORE E. ROKITA
  Attorney General

/s/ James A. Barta
JAMES A. BARTA*
  Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF INDI-
ANA
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov
*Counsel for Plaintiff State of Indiana*


KRIS W. KOBACH
  Attorney General

/s/ Abhishek Kambli
ABHISHEK KAMBLI***
  Deputy Attorney General
OFFICE OF THE KANSAS ATTORNEY GENERAL
120 SW 10th Ave.
Topeka, KS 66612
(785) 296-7109
Abhishek.Kambli@ag.ks.gov
*Counsel for Plaintiff State of Kansas*


CHRISTOPHER CARR
  Attorney General

/s/ Stephen Petrany
STEPHEN PETRANY*
  Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF
GEORGIA
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
Spetrany@law.ga.gov
*Counsel for Plaintiff State of Georgia*


BRENNA BIRD
  Attorney General

/s/ Eric H. Wessan
ERIC H. WESSAN***
  Solicitor General
OFFICE OF THE IOWA ATTORNEY GENERAL
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric.Wessan@ag.iowa.gov
*Counsel for Plaintiff State of Iowa*


RUSSELL COLEMAN
  Attorney General

/s/ Justin D. Clark
JUSTIN D. CLARK**
  Civil Chief
AARON SILLETTO**
  Executive Director, Office of Civil and Envi-
ronmental
KENTUCKY OFFICE OF THE ATTORNEY GEN-
ERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Justind.Clark@ky.gov
Aaron.Silletto@ky.gov
*Counsel for Plaintiff Commonwealth of Kentucky*

27

LYNN FITCH
  Attorney General

/s/ Justin L. Matheny
Justin L. Matheny*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3825
Justin.Matheny@ago.ms.gov
Counsel for Plaintiff State of Mississippi

ANDREW BAILEY
  Attorney General

/s/ Joshua M. Divine
JOSHUA M. DIVINE*
  Solicitor General
MISSOURI ATTORNEY GENERAL'S OFFICE
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
josh.divine@ago.mo.gov
Counsel for Plaintiff State of Missouri

MICHAEL T. HILGERS
  Attorney General

/s/ Lincoln J. Korell
LINCOLN J. KORELL**
  Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov
Counsel for Plaintiff State of Nebraska

DAVE YOST
  Attorney General

/s/T. Elliot Gaiser
T. ELLIOT GAISER*
  Solicitor General
OFFICE OF THE OHIO ATTORNEY GENERAL
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov
Counsel for the State of Ohio

ALAN WILSON
  Attorney General

/s/ Thomas T. Hydrick
THOMAS T. HYDRICK**
  Assistant Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
Thomashydrick@scag.gov
Counsel for Plaintiff State of South Carolina

MARTY J. JACKLEY
  Attorney General

/s/ Grant M. Flynn
GRANT M. FLYNN***
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 E. Hwy. 14, Suite #1
Pierre, SD  57501
(605) 773-3215
Grant.Flynn@state.sd.us
Counsel for Plaintiff State of South Dakota

28

SEAN REYES
   Attorney General

/s/ Stanford Purser
STANFORD PURSER***
   Deputy Solicitor General
UTAH ATTORNEY GENERAL'S OFFICE
160 East 300 South, 6th floor
PO Box 140856
Salt Lake City, UT 84114-0856
(801) 366-0100
Spurser@agutah.gov
*Counsel for Plaintiff State of Utah*
PATRICK MORRISEY
   Attorney General

/s/ Michael R. Williams
MICHAEL R. WILLIAMS*
   Principal Deputy Attorney General
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Michael.R.Williams@wvago.gov
*Counsel for Plaintiff State of West Virginia*

JASON S. MIYARES
   Attorney General

/s/ Kevin M. Gallagher
KEVIN M. GALLAGHER**
   Principal Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S OFFICE
202 North 9th Street
Richmond, Virginia 23219
(805) 786-2071
kgallagher@oag.state.va.us
*Counsel for the Commonwealth of Virgini*

**\* Admitted Pro Hac Vice**

**\*\* Pro Hac Vice Application Pending**

**\*\*\* Pro Hac Vice Application Forthcoming**

## CERTIFICATE OF SERVICE

   I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 31st day of May, 2024 to all counsel of record. The document was further served via email on the following, who have represented themselves to the undersigned as counsel for Defendants in this matter.

**Jacob S. Siler**
**Allyson R. Scher**
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 353-4556
jacob.s.siler@usdoj.gov
allyson.r.scher@usdoj.gov

*Counsel for Defendants*

            */s/ Steven J. Griffin*
            STEVEN J. GRIFFIN
            Office of the Tennessee Attorney General
            P.O. Box 20207
            Nashville, Tennessee 37202
            steven.griffin@ag.tn.gov

            *Counsel for Plaintiff State of Tennessee*